MARMET COAL CO. v. PEOPLE'S COAL CO.

(Circuit Court of Appeals, Sixth Circuit. October 15, 1915.)

No. 2594.

1. EVIDENCE ☞441—PAROL EVIDENCE—WRITTEN INSTRUMENTS—ADMISSIBILI-TY—"EXPRESS WARRANTY."

Notwithstanding Gen. Code, Ohio, § 8392, declares that any affirmation of fact or any promise by the seller relating to the goods is an express warranty, if the natural tendency of such affirmation is to induce the buyer to purchase, an oral representation made in the negotiations leading up to a written contract of sale is not admissible to establish a warranty, where the written contract purported to declare the agreement between the parties.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1719, 1723–1763, 1765–1845, 2030–2047; Dec. Dig. ☞441; Contracts, Cent. Dig. § 1616; Sales, Cent. Dig. § 721.

For other definitions, see Words and Phrases, First and Second Series, Express Warranty.]

2. SALES ☞273—WARRANTIES—IMPLIED WARRANTIES.

Where secondhand coal barges are sold, there is no implied warranty that they are equal in quality to the new, but only that they are reasonably fit for the purpose for which they are intended.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 772–776; Dec. Dig. ☞273.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. SALES ☞437—ACTIONS FOR BREACH—PLEADINGS.

Where the seller's false statement as to the age of coal barges and as to whether they were made of pine or hemlock were not alleged as warranties, no recovery could be had on that ground.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1248–1257; Dec. Dig. ☞437.]

4. SALES ☞285—ACTION FOR BREACH OF WARRANTY—NOTICE.

Under Gen. Code Ohio, § 8429, a purchaser has neither right of action for breach of warranty in a contract of sale, nor defense to an action for the purchase price, unless notice thereof is given within a reasonable time after ascertaining it.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 806–808, 810; Dec. Dig. ☞285.]

5. SALES ☞285—ACTIONS—JURY QUESTION.

What is a reasonable time within which to give notice to a seller of breach of warranty is usually one of fact for the jury, though it may be one of law, where there is no room for different inferences and the facts are undisputed.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 806–808, 810; Dec. Dig. ☞285.]

6. SALES ☞288—BREACH OF WARRANTY—DEFENSES.

Where a buyer, after discovering the seller's breach of warranty as to the seaworthiness of coal barges, renewed or paid the purchase-money notes the breach was waived.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 817–823; Dec. Dig. ☞288.]

7. CORPORATIONS ☞428—KNOWLEDGE OF OFFICERS—KNOWLEDGE OF CORPORATION.

A corporation is charged with knowledge of its president and vice president of defects in coal barges which it purchased, as well as with knowledge of defects discovered by the superintendent of transportation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. ☞428.]

8. SALES ☞441—WARRANTIES—BREACH—EVIDENCE.

That, a year after the first delivery, coal barges were discovered to be unseaworthy, it appearing that several trips had been made in the interim, is not substantial evidence that they were unseaworthy at the time of sale.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1277–1283; Dec. Dig. ☞441.]

9. SALES ☞439—BREACH OF WARRANTY—BURDEN OF PROOF.

Under the facts of the case, the buyer, who claimed that the seller breached a warranty as to the seaworthiness of coal barges, had the burden of proving that the unseaworthiness of certain of the barges was not discovered before a given date.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1258–1260; Dec. Dig. ☞439.]

10. SALES ☞441—BREACH OF WARRANTY—EVIDENCE.

In an action for breach of warranty in a sale of coal barges, evidence *held* insufficient to show that the unseaworthiness of certain barges was not discovered before a given date.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1277–1283; Dec. Dig. ☞441.]

In Error to the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by the People's Coal Company against the Marmet Coal Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

A. A. Kramer, of Cincinnati, Ohio, for plaintiff in error.

Murray Seasongood, of Cincinnati, Ohio, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge. On May 31, 1911, plaintiff contracted in writing for the sale to the defendant of 55 secondhand coal barges, at an aggregate price of $53,632, less a discount of 5 per cent.; 33 of the barges were then empty and ready for delivery; the others were loaded. For the 33 empty barges notes were to be at once taken at 90, 180, and 270 days. The remaining 22 barges were to be turned over as soon as empty "at their present location," notes to be given as in the case of the 33 mentioned. The first 32 barges were settled for June 1, 1911. June 29, 1911, 6 more barges were similarly settled for. July 31st settlement was made in the case of 6 more, September 5th for the same number, and on November 13, 1911, for the remaining 5. The notes were all paid, except the 5 (aggregating about $10,-000) which are the subject of this suit; part being original notes, and others being renewals. Defendant pleaded that the purchase was made upon plaintiff's representation "that the barges were in good and navigable condition and that they were not out of repair"; whereas they were, as alleged, materially out of repair, some of them in such bad condition that they could not be loaded, and others requiring much expense in putting them in navigable condition. By cross-petition defendant sought to recover damages on account of barges already paid for in ignorance of their true condition. The case was tried in April, 1913. At the conclusion of defendant's testimony verdict was directed for plaintiff for the face of the unpaid notes, with interest.

Attached to the contract was a list of the barges, showing the material (whether pine or hemlock), the age and number of each barge, and its price. The stated ages ranged, in the case of hemlock, from 3 years and 1 month to 5 years, and in the case of pine from 4 years and 1 month to 9 years and 7 months. The schedule showed 43 of the barges to be pine and 12 hemlock. The prices ranged from $552 to $1,145. There was testimony tending to show an oral representation by plaintiff, relied upon by defendant, that the barges were seaworthy and in good condition; that in the opinion of witnesses, based solely upon the appearance of the barges, all were considerably older than stated in the sales list, such excessive age being variously estimated at from 1 to 4 years; that 16 of the barges were hemlock; that the life of a pine barge is from 10 to 15 years, and of hemlock from 6 to 9 years; that some of the timbers in 21 or 22 of the barges were found, at one time or another, to be decayed to a greater or less extent, due, in the opinion of witnesses, to old age, and not usage; that several barges had become nonfloatable, and had been beached, before the trial; that the bottoms were torn from 3 to 4 of the barges while being towed, because the bottom timbers had been insufficiently spiked.

Defendant's vice president, who was the head of its transportation department, "went over the barges empty before signing the contract to see that they were all right and that there were no holes in them" (this evidently applies to at least 25 barges). Two of the barges which reached the mines in September, 1911, were at the time, unseaworthy, and were never loaded. Defendant's vice president knew their condition when they arrived. The remaining 53 barges made each one or more round trips between Cincinnati and the mines; the average number of such round trips, per barge, between June 26, 1911, and the time of trial, being 4.9. The distance from Cincinnati to the mines was 275 miles; a round trip taking from one to two weeks, although loaded barges were sometimes held up much longer by the stage of water.

As the barges reached defendant's mines at Marmet from time to time, they were all examined, in accordance with its regular practice, by its employé in charge of the inspection and repair of barges and their distribution to the mines, and report made to the company's office (apparently at Marmet) whether or not they were in condition to be loaded. If repairs were necessary, they were made, and each month the repair book, showing amount expended for repairs by barge number, was turned into the office at Marmet, and report of such repairs made to the vice president at the Cincinnati office. These repairs, previous to June 1, 1912, amounted to $2,444.15, and after that date to $2,181.61. All the barges were so examined as stated above between August and December, 1911. Defendant's vice president personally had general knowledge of the alleged bad condition of the barges, in March, 1912 (and that some of them had rotten timbers), but claimed not to have had complete knowledge as to all these barges until June, 1912. Plaintiff sued July 8th. Until after this suit was begun, defendant purposely refrained from complaining to plaintiff about the barges. After December, 1911, and thus after the last of the barges had been delivered and had reached the mines and been so examined, and after the alleged unseaworthy condition of some of the barges had been discovered, defendant made payments or renewals of notes belonging to each of the several series representing the several deliveries, and like payments or renewals as to notes in each of such series were made on or after March 1, 1912. Its failure to pay in full was due only to lack of funds.

The District Judge based his direction of verdict upon the proposition that defendant had unreasonably delayed complaining of the alleged breach of warranty, having in view its opportunity to inspect and its actual inspection in part, and the fact that the alleged rotten condition of timbers could have been readily discovered by boring, being of opinion that testimony that such boring would be injurious was plainly unreasonable. We do not find it necessary to determine whether defendant was bound to test the timbers, by boring or otherwise, before acceptance, or whether as to all the barges the case may be disposed of solely upon the ground adopted by the District Judge, for we think affirmance of the action taken below is, in any event, compelled in view of the further considerations to which we shall call attention.

[1] There was no express warranty of the condition of the barges, unless contained in the oral representation referred to. This representation is, however, not available to defendant as a warranty; for, although the Ohio Uniform Sales Act provides (G. C. § 8392) that "any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon"; yet the rule is well settled that a parol representation is not admissible in the absence of fraud or mutual mistake, when the written contract purports to contain the entire agreement. Seitz v. Brewing Co., 141 U. S. 510, 516, 12 Sup. Ct. 46, 35 L. Ed. 837; Huntington v. Railway Co. (C. C. A. 6) 175 Fed. 532, 537, 99 C. C. A. 154; Union Selling Co. v. Jones (C. C. A. 8) 128 Fed. 672, 675, 63 C. C. A. 224; Power Co. v. Crane Co., 208 Ill. 218, 226, 70 N. E. 319. The representation in question was made in the course of negotiations leading up to the contract. While these negotiations were partly oral and partly by correspondence, the transaction finally took the shape of a written contract, apparently purporting to contain the entire agreement, stating number and location of the respective barges, the barge number, the material, the age of each, the price at which each was sold, the discount, the place of delivery, and details respecting the notes to be given in payment. It did not contain the representation in question, and there is no allegation of fraud or mistake. The case is unlike Joslyn v. Cadillac Co. (C. C. A. 6) 177 Fed. 863, 101 C. C. A. 77, in which there was no written agreement, and differs from Bolt & Nut Co. v. Rodd (C. C. A. 6) 220 Fed. 750, —— C. C. A. ——, in which there was no contract apart from the correspondence, all of which, taken together, was there held to make up the contract.

For the purpose of our disposition of the case, and in view of the fact that provision for inspection was not carried into the subsequent written contract of sale, we shall assume (without so deciding) that under section 8395 (1) of the Code (quoted in the margin [1]) a warranty was implied that the barges were reasonably fit for the purpose intended, notwithstanding plaintiff did not itself build the barges, provided defendant relied on plaintiff's judgment. We shall further assume (also without deciding) that a mere right to inspect, if unexercised, is not conclusive, as matter of law, against the seller's liability under his warranty, for even obvious defects, in the absence of agreement that such will be its effect.[2]

[2] The barges, however, were known to be secondhand, and such implied warranty would thus not be that the barges were equal in

[1] "When the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

[2] See, in this connection, Gen. Code Ohio, §§ 8428, 8429, 8449; Williston on Sales, § 249, p. 35; Benj. on Sales (5th Eng. Ed.) 626–628; Marx v. Locomobile Co., 82 Misc. Rep. 468, 144 N. Y. Supp. 937, 938; Nelson v. Silver, 160 App. Div. 445, 145 N. Y. Supp. 124, 127.

quality to new, but only that they were reasonably fit for the purpose for which they were intended, and would not extend to the length of time the barges would last, but apart from the effect to be given the statement of ages contained in the memorandum attached to the contract, would be satisfied if presently seaworthy. Morley v. Consolidated Mfg. Co., 196 Mass. 257, 81 N. E. 993; Williston on Sales, § 232, at p. 308.

[3] The fact that many of the barges appeared older than shown in the sales memorandum is not alone enough to entitle defendant to damages; for the statement of ages is not alleged as a warranty, possibly because of defendant's testimony that its transportation superintendent and one or more of its other employés who looked after the barges could tell by a superficial inspection, when empty, their approximate age, with some limitation dependent upon nature of usage, and all were so inspected at least by December, 1911; and as the barges were sold as second-hand and of varying ages, and thus of varying periods of beneficial use, a mere variation in age to the extent alleged would have no substantial tendency to show that the barges were actually unseaworthy when delivered, which was the only warranty we are concerned with in view of the pleadings. The fact that the trial court admitted evidence of the apparent ages of certain individual barges does not change the situation, not only because of the inspection referred to, but because at least two of the notes given therefor were paid or renewed after such inspection.

The alleged fact that there were more hemlock barges than represented is immaterial under the pleadings, as no warranty in this regard is alleged, perhaps because of defendant's testimony that the difference was readily apparent. This question was properly withdrawn by the court before final direction of verdict.

[4, 5] Again, unless defendant gave notice of the alleged breach within a reasonable time after it knew of it, defendant has no right of action and no defense. Ohio Code, § 8429. True, the question whether delay is reasonable or unreasonable is usually one of fact, and always so where reasonable minds may draw differing inferences from the probative facts; yet where the facts are undisputed, and there is no room for differing inferences, the question becomes one of law. International Corporation v. Stadler (C. C. A. 6) 212 Fed. 378, 382, 129 C. C. A. 54.

[6, 7] It is clear that defendant cannot be heard to complain of alleged misrepresentations with respect to barges for which it has paid with full knowledge of the alleged breach. Taylor v. Bank (C. C. A. 6) 212 Fed. 898, 129 C. C. A. 418. And it is equally clear that a renewal or extension of time upon purchase-money notes has the same effect as payment in cash. The knowledge imputable to defendant is not limited to its president or to its vice president (who acted for it in the purchase of the barges), or to the officer who made the payments, but extends to other agents, such as the superintendent of transportation (whose duty it was to look over the empty barges and note their condition), the employé in charge of inspection and repair of the barges and their distribution to the coal mines, as well as the harbor

masters, whose duty it was to see that the boats were in proper condition for use before loading. See G. R. & I. Ry. Co. v. United States (C. C. A. 6) 212 Fed. 577, 583, 129 C. C. A. 113. As to barges the alleged rotten condition of whose timbers was known as early as March 1, 1912, this defense was plainly waived by the payments made thereon between that date and the commencement of suit, coupled with defendant's deliberate determination not to complain. For example, the two barges known to have been unseaworthy when delivered are within this class. The same considerations apply to alleged unseaworthiness in the other respects mentioned. The fact that defendant refrained from complaining because it needed the barges, and later wished to avoid suit by reason of its financial condition, does not alter the situation in this regard.

[8] In view of the considerations we have stated, including the hard usage to which coal barges are subjected, and the further fact that repairs on barges were with defendant an almost daily occurrence (defendant had between 80 and 100 barges, besides those bought from plaintiff), the mere fact that given barges required repairs, some before and some after June, 1912 (which date was fully a year after the first delivery of the barges and more than six months after the last of the deliveries), would have no substantial tendency to show that they were actually unseaworthy when delivered. No one so testifies, and in the absence of such testimony a conclusion that the repairs were made necessary by an unseaworthy condition existing when the barges were delivered, rather than by accident, progressive deterioration from mere lapse of time, or some other cause, would rest upon conjecture alone; and in this connection it may be said that the mere fact that repairs were made upon the entire lot of secondhand barges, amounting, in about 1½ years, to but little more than 8 per cent. of the aggregate purchase price has no substantial tendency to show that the lot generally or as a whole was unseaworthy when delivered. It is also plain that an inference of unseaworthiness at the time of delivery is too conjectural to justify recovery, where the alleged rottenness of the timbers was affirmatively shown not to have been discovered until June or July, 1912, and after from two to five round trips had been made between Cincinnati and the mines.

[9, 10] There are perhaps 6 or 8 barges shown to have had rotten timbers in July or August, 1912, and in the case of some to an extent making further repair useless or inadvisable; it not affirmatively appearing at what time such condition was first discovered. Assuming, as perhaps we should, that the testimony (especially as to the condition of the barges at the time stated) tended to show that they were unseaworthy when delivered to defendant, we think the burden rested on it to show that such unseaworthiness was not known before March 1, 1912. We think this conclusion logically results from the facts of defendant's inspection of the barges from time to time (especially the examinations to determine whether the barges needed repairs and were in condition to be loaded, which seem to have practically involved apparent present seaworthiness), its practice of making repairs, and its early knowledge that there were, as claimed, substantial breaches of

the alleged warranty respecting several of the barges, including decay in timbers and knowledge that the ages of many were, as claimed, misrepresented, the natural probability that actual unseaworthiness existing at the time of delivery would normally have been discovered before March, 1912, defendant's deliberate determination not to complain of any defects and its actual abstaining therefrom until after suit was begun, and the fact that the time of such discovery was peculiarly within defendant's knowledge. This burden has not been sustained.

We have considered the case of each separate barge so far as shown by the record. As we understand the situation, defendant is precluded from recovery, as respects each of the barges in question, through the application of one or another of the principles we have declared applicable. It follows that, in our opinion, the court did not err in directing verdict for plaintiff. It need scarcely be said that defendant was not legally prejudiced by the granting of plaintiff's motion to direct verdict, after the court had once declined to do so.

The judgment of the District Court is affirmed, with costs.