## MIAMI CYCLE & MFG. CO. v. NATIONAL CARBON CO.

(Circuit Court of Appeals, Sixth Circuit. July 29, 1920.)

No. 3287.

1. **Sales ⊜⟶179(4)—Purchaser estopped by acceptance to deny equality to sample.**

Defendant *held* not justified in refusing to accept further deliveries under a contract for the purchase of 2,500 self-starters for motorcycles, to be made by plaintiff, on the ground that they were not like the sample approved before the contract was made, where the principal difference was that the sample was made by hand, plaintiff not having previously made starters for motorcycles, while the parts of the commercial articles were machine-made, as must have been contemplated by the contract, and where a sample of the latter was also submitted before deliveries began, and defendant, during ensuing months, accepted and paid for several hundred.

2. **Evidence ⊜⟶441(9)—Warranty cannot be imported into written contract by prior conversations.**

A warranty cannot be imported into a written contract of sale which is silent on the subject by conversations or correspondence between the parties before the contract was made.

3. **Sales ⊜⟶271—Contract held to raise no implied warranty of fitness under Uniform Sales Act.**

Where defendant, a maker of motorcycles, desired a self-starter for its machines, and plaintiff, a manufacturer of self-starters for automobiles and motorboats, thereupon made a model, which, after alterations agreed upon, was approved by defendant after a test of some weeks, and a contract made for several hundred, there was no implied warranty, under Gen. Code Ohio, § 8395(1), of general fitness for the use intended, or beyond a warranty of suitable materials and proper workmanship.

4. **Sales ⊜⟶384(6)—Uniform Sales Act construed as to vendor's damages for vendee's refusal of article to be specially manufactured.**

Under Gen. Code Ohio, §§ 8443, 8444, as to damages recoverable by seller for buyer's breach, where buyer of motorcycle self-starters specially manufactured for it repudiated the contract, plaintiff seller was properly allowed to recover the full contract price of the starters delivered, and, as to those not delivered, the contract price, less the cost of completion, and less the value of the finished starters and of the unused materials procured or made for this purpose, all as left on plaintiff's hands, and such measure of damages as to the undelivered goods, even if title had not passed, was not erroneous, on the ground that damages should properly be stated as cost incurred, less salvage, plus lost profits, for cost plus profit equals contract price, and whether this damage is given under the name of the whole or under the names of the parts is unimportant.

5. **Sales ⊜⟶384(6)—Lost profits recoverable for refusal to accept goods to be specially manufactured.**

The provision of Gen. Code Ohio, § 8444 (4), "The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages," does not change the settled rule that lost profits, in case of buyer's refusal to accept goods to be specially manufactured for it, are recoverable as such, nor contemplate that lost profits shall be treated only as an element of the situation, to be given such force as the trier of fact may think proper, but rather declares that this element of damage shall remain, and shall be added to whatever other elements appear.

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Interest ⊕=53—Inclusion of interest on verdict not error.**

Where judgment on a verdict was delayed pending a motion for new trial, the inclusion in the judgment of interest on the amount of the verdict, although the verdict itself included interest, *held* not error, under Gen. Code Ohio, § 8305, and the established practice in the state.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Action at law by the National Carbon Company against the Miami Cycle & Manufacturing Company. Judgment for plaintiff and defendant brings error. Affirmed.

The Carbon Company, as the successor of the Ever-Ready Company (hereinafter called plaintiff), brought suit in the court below upon a contract by which the plaintiff agreed to manufacture and sell, and the Miami Company (hereinafter called defendant) agreed to buy, at $30 each, 2,500 mechanical self-starters, for use in connection with the motorcycles which the defendant was making. About half of these had been delivered, and the greater part of the purchase price thereof paid, when the defendant refused to proceed with the contract, alleging that the self-starters were not in accordance with it, but were worthless, and demanded a return of what it had paid, and damages. The plaintiff brought this suit to recover the unpaid balance of the purchase price of those delivered, and its damages on account of the remainder which the purchaser refused to take; the defendant denied liability and sought judgment by way of counterclaim; and, at the conclusion of a trial before a jury, the court instructed a verdict in favor of plaintiff for the amount of its claim. The substantial question is whether there was any evidence to go to the jury to support defendant's theory of defense or of counterclaim.

The contract of sale was in writing and was an Ohio contract. It consisted of an offer by letter and an acceptance. Plaintiff was engaged in the manufacture of a mechanical self-starter, known as the "ever-ready," for automobiles and motorboats. Representatives of plaintiff and defendant discussed whether this could be modified in size and form to make it suitable for motorcycles, and arranged that plaintiff should build a model of such modified character. Plaintiff did so, and furnished the model to defendant. Defendant tested the model for some time and thereupon wrote to plaintiff, under date of August 8, 1912, "You will please enter our contract for 2,500 self-starters for motorcycles, to be exactly as per sample recently submitted and O. K.'d by us." Shipments in small quantity began in December, 1912, and continued in quantities of 100 to 200 per month until October, 1913. Defendant attached starters to a few of its motorcycles, and put them out in the spring and summer of 1913, but not in any considerable numbers, until December, 1913, and January, 1914. It soon developed to the defendant's satisfaction that the starters were a commercial failure. For some reason, they did not stand up satisfactorily in actual use. There was much correspondence and negotiation between the parties, and plaintiff, while disclaiming responsibility, made changes in the effort to meet defendant's complaints. Finally, in March, 1914, a test was arranged at defendant's factory, in which plaintiff participated, without waiving its right to insist that no question remained open. Upon this test of five starters, they operated correctly for a time; but each one eventually gave out, for some one of several varying causes, about which the parties did not agree. Defendant then finally repudiated the contract.

Thomas B. Paxton, Jr., of Cincinnati, Ohio, and Quincy A. Myers, of Indianapolis, Ind. (Myers, Gates & Ralston, of Indianapolis, Ind., Ben F. Harwitz, of Middletown, Ohio, and Paxton, Warrington & Seasongood, of Cincinnati, Ohio, on the brief), for plaintiff in error.

⊕=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Judson Harmon, of Cincinnati, Ohio (Harmon, Colston, Goldsmith & Hoadly, of Cincinnati, Ohio, and Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] Defendant's first contention is that the starters were not "exactly as per sample." This contention arises under conditions which require it to be carefully scrutinized. Although about one-half of the starters contracted for were shipped and received, and most of them were paid for, and the record contains a body of correspondence between the parties extending over several months with reference to the imperfections of the starter, and the oral testimony shows discussions and negotiations between them on the same subject for a long period, the claim that the starters were not like the sample was never distinctly made until the answer was filed. The substance of all the complaints made was that the starter did not perform in accordance with a supposed warranty, and a lack of correspondence with the sample was, at the most, only suggested by the complaint that "some parts seem to be made of the wrong material."

Coming to the trial of this issue—difference between sample and starters—we find that the alleged discrepancies consist in changes in design, in the materials and in quality of workmanship. So far as concerns changes in design, the undisputed testimony is that they were of unsubstantial character, and were agreed upon between the engineers for the respective parties before quantity production commenced. The one later change had reference to the size of one part, caused by defendant's mistake, and discovered after the first 100 had been made, and corrected by furnishing a fitting washer, all as agreed upon by, and to the satisfaction of, both parties. Clearly, in this class of discrepancy, there is nothing to justify rejection.

As to difference in materials used: It appears that the back plate, in the sample, had been "roughed out" from a piece of steel boiler plate, while, in the later manufactured starters, it was a gray iron casting. The evidence also tends to show that the ratchets and dogs in the sample were manufactured by hand from tool steel, while, in the later starters, they were made by the drop-forging process, from a steel suitable for that purpose, and of qualities not wholly the same as tool steel. No other discrepancies in materials are suggested. Both of these are dependent upon, and incidental to, the difference between production of a sample by hand work and quantity production by ordinary factory processes, and it is not open to defendant to rely upon either of them.

The contract was for a large quantity. The correspondence shows that defendant knew plaintiff was intending to manufacture, not by hand, but by the use of jigs, dies, etc. After the making of the contract, the plaintiff expended a large amount of time and money in the making of these preparations for quantity production, and then, before going on, submitted for approval another sample manufactured by these methods. This sample defendant passed upon and approved,

save for some slight changes which were made by agreement.[1]   Then quantity production began, and defendant received and paid for several hundred.   Defendant does not claim that it ever supposed the back plate, with its right-angled posts, would be cut out by hand from a thick steel plate like the sample.   Defendant was expert in the general methods of metal working, and knew that such a method of making would be commercially impossible.   Nor does it claim that it supposed plaintiff would use for the ratchets and dogs any grade of steel not workable by the drop-forging process.   The substitution of the cast-iron plate was known to defendant from the beginning, and not objected to.   Such substitutions of material as were necessarily incidental to quantity manufacture must be deemed within the contemplation of the parties in making such a contract, and did not constitute a departure therefrom.

Whether to such a substitution it was reasonably necessary that this back plate shoud be of gray iron casting and of the specific thickness here adopted might have been open to question.   Perhaps, within the limits of good manufacturing methods, it might have been made of stronger material or of heavier form.   Those questions are not open to defendant.   A back plate made as these were was considered by plaintiff to be the one called for by the contract, and it was tendered to the defendant as such; no one can say that the tender was not in good faith, or that the iron back plate may not have been a full, substantial compliance with the contract; and the defendant accepted it as a compliance with the contract.   This acceptance was not only of the special second sample tendered for that purpose, but continued over a course of business lasting through some months.   Under such conditions, defendant cannot say that the article it received is not the article which it bought.   See cases cited in 23 R. C. L. "Sales," § 264; Marmet Co. v. People's Co. (C. C. A. 6) 226 Fed. 646, 651, 141 C. C. A. 402.   Of course, this conclusion is not inconsistent with the existence of an implied warranty of fitness of material, which might survive some measure of acceptance.   That subject is considered later.

There is nothing to indicate that there were any differences in workmanship, beyond those which would be inherent in the contemplated method of manufacture, and these cannot avail defendant.   The only matter carrying a suggestion of difference in the quality of the workmanship is that which is discussed hereafter under the subject of reasonable fitness, and with reference to clearance; but the testimony is even less sufficient to show a difference in this respect between the model and the mass of the starters than it is to indicate unfitness.

It is said that these conclusions depend upon defendant's estoppel, and that plaintiff cannot recover on that ground, because no estoppel was specially pleaded in reply to defendant's answer, as the Ohio pleading rules are said to require.   We do not so regard the situation.   If defendant kept silent while it knew that plaintiff was expending money

---

[1] There is no express evidence of such approval, but from the making of some changes by request, and the making of shipments thereafter, the inference of approval in other particulars is inevitable.

preparing to make, and expecting to tender under a contract, articles which were a substantial departure from that contract, a pure question of estoppel would arise, and this rule of pleading would require consideration. In this case, the article furnished was offered, not as a departure, but as the very thing which both parties contemplated, taking into account the expected method of manufacture, and acceptance of the article was confession of identity. If there is an element of estoppel thereby involved, it is sufficiently pleaded, because the declaration alleges that the starters were tendered and accepted as being the contract articles.

Perhaps, as to the starters not delivered when defendant repudiated the contract, there is more color of estoppel, because, as to them, defendant never accepted; but, even if defendant's obligation to accept these be considered as in some measure dependent upon estoppel, rather than upon that construction of the contract which had become fixed and settled by the action of both parties, the fact of the estoppel is so far merely an incidental step in reaching the result that not even a strict rule can require it to be pleaded.

It is rather vaguely suggested that the jury would be authorized to find the existence of substantial differences between the model and the starters, because the model worked satisfactorily and the starters did not. In many cases, such an inference might be justified from that fact alone. To do so here would require findings that there was marked inferiority of performance and that it was due to this cause. The first would be doubtful here. The model was kept by defendant for test only three weeks, and there is no proof that it was subjected to tests comparable in severity to those which caused the starters to be rejected. As to the second, there are so many other circumstances which might fully have accounted for any comparative inefficiency of operation (if there was any) that for the jury to attribute to it some unknown discrepancy between model and finished article would be that mere surmise upon which the law will not permit a jury to act. Richards v. Mulford (C. C. A. 6) 236 Fed. 677, 680, 150 C. C. A. 9. The model was attached in a certain method to a motorcycle engine in use in 1912. In 1913 the form of the motorcycle had been changed, and a different form of attachment was used, which might have materially affected the operation.

This is an illustration of several other matters to which any existing difference of performance can as well be charged as to some undiscovered difference between sample and starters. We are satisfied, therefore, that upon this record there was nothing to go to the jury to support defendant's contention that the starters were not like the sample, within the fair meaning of the contract.

[2] Defendant next contends that there was an express warranty of efficient performance. In support of this contention, reliance is had upon correspondence and conversations which occurred before the written contract was made. A warranty cannot thus be imported into a contract which is silent on the subject. Blue Grass Co. v. Steward (C. C. A. 6) 175 Fed. 537, 540, 99 C. C. A. 159; Marmet Co. v. People's Co., supra., 226 Fed. at page 650, 141 C. C. A. 402.

In the same connection, defendant complains because it was refused permission during the trial to file a second amended answer, setting up a similar express warranty made after the delivery and acceptance of the first part of the starters, and pending negotiations as to the remainder. Counsel rely upon the theory that, when a controversy has arisen between buyer and seller as to whether there has been a breach by the seller, and the buyer claims the right to repudiate because of such breach, it has the power to do so with or without right, and its forbearance to do so and continuing in performance is a sufficient consideration for a further promise or warranty by the seller applying to the whole contract, past and future. We need not consider the soundness of this theory. What happened here was that after defendant had expressed its dissatisfaction, and intention not to continue unless the starter could be so modified as to work properly, both parties engaged in negotiations as to such modifications. Defendant was willing to complete the contract, if satisfactory changes could be made, and plaintiff, protesting that it was under no obligation to do so, joined in an experiment as to some changes. It is at this time and in this connection that the additional warranty is said to have been made; but nothing came of this. The desired changes were never agreed upon. The defendant did not continue under the contract and forbear to repudiate, but, after some delay, refused to reconsider and confirmed its repudiation. Clearly, the theory of its proposed amendment does not fit these facts, and it was rightly disallowed.

[3] The next contention is that, since the plaintiff knew the particular purpose for which these articles were required, and since the defendant relied on the plaintiff's skill and judgment as an expert manufacturer of these things, there was an implied warranty, under section 8395 (1) of the Ohio General Code, that the starters would be reasonably fit for the purpose for which they were intended; but that they were not reasonably fit therefor, whereby the defendant was entitled, both by way of defense and counterclaim, to all the damages that flowed from such breach. We assume, for the purposes of this opinion, that there was no acceptance which would, as matter of law, bar such claim to damages (see Kansas City Co. v. Rodd [C. C. A. 6] 220 Fed. 750, 755, 136 C. C. A. 356; Gen. Code Ohio, §§ 8427, 8429); but we see nothing in the record which would have justified a finding that the defendant relied upon plaintiff's skill or judgment within the meaning of this section. It was understood by both parties that this article had never been manufactured in forms suitable for this purpose; to modify the plaintiff's self-starter used on automobiles and boats, and adapt it to successful use on motorcycles, involved questions of design and manufacture with which plaintiff was specially familiar, and questions of combining the starter with and attaching it to a motorcycle and using it there, about which plaintiff knew nothing and as to which, the defendant would be comparatively expert.

The second class of questions was at least as important as the first, and perhaps involved more uncertainties. In addition, there was the further question whether, however perfect the device might be, and

however perfectly its combination with the motorcycle engine and frame was accomplished, it would be a commercial success by reason of its ability to meet the hard usage attendant on motorcycle travel and the ignorant or careless treatment commonly given by the ordinary user. Upon this subject, neither party could be positive; but the defendant was the better qualified of the two to be judge. It was obvious that there could be no safety to either party in a contract until there had been a satisfactory test, and both parties proceeded on that theory. The first model was found objectionable; the second model was worked out with some collaboration, and seemed so satisfactory that defendant's engineer, after tests during only one day, approved it and sent it to the plaintiff to have manufacture begin. The plaintiff returned it to defendant, saying:

"We are returning to you the starter which you had for test before, for the purpose of you giving same a further thorough test. We hope that you will arrange to keep this starter working for at least several weeks, so in case any defect should show up during the severe test you can notify us and we will be able to remedy same. We don't expect that you will find any trouble whatever; but, as this starter has not had a sufficient time test, we want to make sure, before going ahead with all the work, that it is perfectly right."

During the ensuing three weeks, defendant made every test it cared to, and then made the written contract. In the face of such a record as this, there can be no implied warranty of general fitness for the intended purpose.

However, there remains room for the contention that, so far as there was substitution of materials for those contained in the sample and as made necessary by the contemplated methods of manufacture, the material substituted should be reasonably fit for the intended purpose. Specifically, this means that the contention should be examined with reference to the cast-iron back plate and the drop-forged dogs and ratchets. As to the back plate, it would seem that those qualities of cast iron which would make it fit or unfit would be as well known to defendant as to plaintiff. At any rate, no witness said that the material was unfit, or that any trouble came because of such unfitness.

As to the quality of steel in the dogs and ratchets, the situation is different. The quality would not be obvious on inspection. These dogs and ratchets seem to have been the parts that generally gave out first, and it is not impossible that, either because of the first selection of the material or because of its quality as affected by the final case-hardening, these parts were too hard or too soft to be fit for their intended use, and therefore either broke or wore sooner than they should; but here, again, we have only surmise. No witness testified that their quality was unsuitable, or that any better quality of steel suitable for drop-forgings could have been used or treated in a way that would have made any difference in the performance of these parts. Their actual giving out, in the starters that went into public use, may have been caused by faulty design, imperfect attachment to the motorcycles, or disregard by the user of any one of several instructions that were considered vital to the success of the device. The conclusion that they gave out because the steel was not reasonably fit

would be not a permissible inference from the testimony, but a selection at random out of several equally probable theories. Richards v. Mulford, supra.

Another trouble which developed should be mentioned: In certain starters that were rejected, it was found that the dogs rode upon a certain collar, so as not to engage properly with the ratchet, and so as to be a possible cause of imperfect operation. It is not impossible that this was the result of lack of care in assembling by plaintiff's workmen, and, if this were true, defendant would have cause of complaint, because that defect would not be apparent by any inspection which defendant was called upon to make; but here, again, there is nothing whatever definite upon which any such finding could be based. Plaintiff fixed over some starters, by grinding off this collar, giving more clearance. The most natural inference from what was said and done on this subject is that it was thought there would be an improvement upon the model, if it was departed from in this respect. If the trouble was due to defective assembling, no one says so, and the starters which were altered in this respect were no more satisfactory to defendant than they had been before.

Upon review of all these matters, and others not mentioned, we must conclude that upon this subject also—the breach of an implied warranty—there was nothing sufficiently definite to go to the jury. We cannot be content to reverse this case upon such mere doubts as to whether the evidence justified an instructed verdict as might be sufficient under other conditions. Defendant's conduct, in the direction of acceptance, waiver, and estoppel, was so extreme as to put upon it a heavy burden to lay before the jury at the trial, and to put into the bill of exceptions and preserve for our benefit, clear and substantial evidence tending to show distinctly in what particulars, if any, the starters differed from the model or embodied materials or workmanship that were not reasonably fit; and this defendant has failed to do. It saw fit to rely upon its two theories that changes required for quantity production were substantial departures from the model, and that there was warranty of good performance. Each of these theories we think erroneous, and there should not be an opportunity for another trial upon some other theory, unless it is clear that error exists.

[4] Another question is as to the measure of damages. The court ruled that the contract was first definitely repudiated by defendant in March, 1914, and that the plaintiff was entitled to recover the full contract price of the starters delivered, and, as to those not delivered, the contract price, less the cost of completion and less the value of the finished starters and of the unused materials procured or made for this purpose—all as left on plaintiff's hands. There was no conflict in the evidence on these amounts, and accordingly the court computed the total which it told the jury to find. Counsel now urge an assignment of error to the effect that, for the purpose of fixing plaintiff's duty to minimize damages when it became apparent that the starters would not be accepted (as declared in section 8444 (4) of the Ohio 1910 General Code), the effective date was in the preceding October, and that the plaintiff has therefore erroneously recovered an unknown amount

for work and labor, if not for special materials purchased, after that date; and the record tends to support the claim. However, the point was not saved by any objection or exception; on the contrary, it was defendant's theory, in the pleadings and on the trial, that it did not repudiate the contract until March.

The rule of damages adopted seems to have been in accordance with the settled principles which have been formulated in the Uniform Sales Act, as embodied in section 8444, supra. The only specific criticism made of the rule adopted by the trial court is that the plaintiff was allowed to recover the contract price, diminished as above stated; whereas, under sections 8443 and 8444, it should have received only its actual damages, with due reference to its lost profits. "The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages." The seller's damages, in such a case, where title has not passed—and it is defendant's theory that title has not passed—is cost incurred, less salvage, plus lost profits; and cost plus profit equals contract price. Whether this damage is given under the name of the whole or under the names of the parts is of no importance.

[5] Counsel also urges that the statute does not contemplate lost profit as recoverable, as such, but only that it shall be treated as an element of the situation, to be given such force as the trier of fact may think proper. No precedent is cited for such a construction of this clause, nor do we see justification therefor. Before this act was passed, it was the settled rule that the vendor in such cases was entitled to recover the profit which he would have made, and the statute seems to declare that this element of damage shall remain and shall be added to whatever other elements appear.

[6] The verdict was rendered October 9, 1917, and it included $8,-657 interest. The judgment (delayed by motion for new trial) was entered August 12, 1918, and included $2,454 interest on the verdict. The verdict and this judgment would thus embody about $435 interest on interest; and since the judgment itself draws interest upon its own total, there will be a continual accrual of compound interest. Was there any error on this subject-matter?

Section 8305 of the Ohio General Code of 1910 says that, in cases not covered by express contract, the creditor shall be entitled to interest at 6 per cent., and no more, and section 8303 provides that the parties may agree upon a rate not exceeding 8 per cent., payable annually. There seems to be no provision expressly and universally forbidding compound interest, and the express provision, found in sections 8304 and 8305, that judgments shall draw interest, when taken with the common knowledge that judgments on contract include interest computed to their date, demonstrates that there was no intent to forbid compound interest by any absolute and all-inclusive rule.

Section 8305 permits the allowance of interest upon "settlements between parties"; and with reference to an earlier statute in the same form, and considering a finding or award which had been made in a case, the Supreme Court of Ohio said, in Sproat's Ex'r v. Cutler, Wright, 157, that interest should be allowed upon such award just as

it would be allowed upon the verdict of a jury if judgment had been delayed. This remark was obiter, but it indicates the prevailing practice in Ohio. In Griffith v. Baltimore Co. (C. C.) 44 Fed. 574, 584, Judge Sage, sitting in the United States Circuit Court for the Southern District of Ohio, considered the precise question, reviewed such authorities as there were—one of which was an opinion in that same court by Judge Swing (Gibson v. Cincinnati Enquirer, Fed. Cas. No. 5,391),—and stated that, after consultation with Circuit Judge (later Mr. Justice) Jackson, they had decided that interest upon the verdict should be allowed in computing the amount of the judgment to be entered.

This has doubtless been the practice in the federal courts in Ohio ever since, and we have no reason for departing from it. We are not referred to any Supreme Court decision of Ohio, excepting Sproat's Ex'r v. Cutler. Baltimore Co. v. Griffith was considered by the Supreme Court, in 159 U. S. 603, 605, 16 Sup. Ct. 105, 40 L. Ed. 274, and the point was reserved without discussion or intimation of opinion. We cannot regard Washington Co. v. Harmon, 147 U. S. 517, 590, 13 Sup. Ct. 557, 37 L. Ed. 284, as overruling the earlier Supreme Court cases upon which the conclusion of Judge Sage, in part, depended; nor is what is said in Massachusetts v. Miles, 137 U. S 689, 691, 11 Sup. Ct. 234, 34 L. Ed. 834, inconsistent with the conclusion of Judges Jackson and Sage. In considering R. S. § 966 (Comp. St. § 1605), it was intimated that no sufficient basis could be there found for allowance of interest upon a verdict, but, in this respect, R. S. § 966, is to be distinguished from Gen. Code Ohio, § 8305, which is at least open to the interpretation given to it by the Ohio Supreme Court in assuming that findings and awards are "settlements" under the statute.

The judgment is affirmed.