**Wear Proof Mat Company, Appellee, v. Bastian-Morley Company, Appellant.**

**Gen. No. 35,865.**

Heard in the third division of this court for the first district at the June term, 1932. Opinion filed December 21, 1932.

ASHCRAFT & ASHCRAFT, for appellant; CARROLL J. LORD, of counsel.

CARL R. LATHAM and FRANCIS J. NAPHIN, for appellee.

MR. PRESIDING JUSTICE WILSON delivered the opinion of the court.

This is an action to recover the balance of the purchase price on 100 oil burners sold and delivered by the plaintiff to the defendant in accordance with a certain agreement bearing date of April 8, 1930. These oil burners were shipped by the plaintiff on order by the defendant. The action was tried by the court without a jury resulting in a finding in favor of the plaintiff in the sum of $5,428.75 and costs, and judgment entered upon the finding. It is not denied that the goods were manufactured, ordered, shipped and received. The agreement of April 8, 1930, appears to have been the result of the collaboration of both the plaintiff and the defendant and it appears to have been the intention of the parties that the original shipment of 100 oil burners was preliminary to a continuing arrangement extending over a period of time, which was to result in an ultimate benefit to both parties. On April 19, 1930, the first 10 of these burners were shipped and shipments were made from time to time thereafter until May 28, at which time the order was completely filled.

July 5, 1930, the defendant notified the plaintiff that they were invoicing the burners back to the plaintiff and that they would be held subject to plaintiff's shipping instructions.

It is apparent that a little over two and one-half months elapsed between the time of the delivery of the first shipment of the oil burners delivered under the agreement and the refusal to accept the goods by the defendant.

The agreement of April 8, 1930, was a communication from the plaintiff stating the price at which the articles were to be purchased and providing for future deliveries thereafter for a period of three years. The offer of the seller contained in this communication was to be considered as accepted on the placing of an order by the defendant with the plaintiff for at least 100 of these burners. The order of the defendant was placed and the agreement became mutual. It was provided in this communication of April 8 by the plaintiff, Wear Proof Mat Co., as follows:

"We will and do guarantee each and every burner purchased by you under this arrangement to have been made in a good and workmanlike manner and of good material. If any of these burners, or any parts of them, shall fail through defects in workmanship or material, within one year from date of shipment to the actual user, we will replace the defective part or parts, free of charge or cost for the same upon return to us of such defective parts."

It is insisted that the judgment should be reversed for the following reasons:

*First,* the overwhelming preponderance of the evidence supported defendant's position that the burners were not manufactured in a good and workmanlike manner, as plaintiff expressly warranted in the contract of purchase;

*Second,* there was an implied warranty from the plaintiff to the defendant that the burners were reasonably fit for the purpose of being resold for use as oil burners in heating residences.

A careful examination of the testimony shows that the principal objection to the burners furnished by the plaintiff rests not so much on the failure to provide good material as it does on the failure to make them in a good and workmanlike manner. The material that entered into the manufacture of these arti-

cles so far as we can find was in and of itself of good grade and free from defects.

The principal points of difficulty arise, however, when we come to consider the question as to whether the burners were made in a good and workmanlike manner as contemplated by the express warranty and also under the implied warranty, as provided in section 15 of the Uniform Sales Act, Cahill's Illinois Revised Statutes of 1931, ch. 121a, ¶ 18, and the exception thereto, number one (1), as follows:

"18.] § 15. IMPLIED WARRANTIES OF QUALITY.] Subject to the provisions of this Act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

Plaintiff takes the position that in this case the defendant did not rely upon any warranty express or implied that the manufactured article was fit for the particular purpose intended, but on the other hand made a long and exhaustive research as to its fitness before accepting plaintiff's burner and ordering shipment to its factory at LaPorte, Indiana.

Prior to the making of the agreement of April 8, 1930, neither the plaintiff nor the defendant had been engaged in the manufacture or sale of oil burners. The defendant was a corporation engaged in the manufacture of boilers and water heaters and was located at LaPorte, Indiana, and in the fall of 1929, decided to enter the field of marketing oil burners and oil burn-

ing boilers in addition to those already manufactured and sold by it. For the furtherance of this purpose the defendant employed one Knox who had a number of years' experience in the oil burner field and although not an engineer, nevertheless was somewhat familiar with the construction and operation of oil burners. Knox, apparently, was seeking to find a burner which could be used by the defendant and was told that Peterson, the president of the plaintiff company, Wear Proof Mat Co. of Chicago, a corporation, had been experimenting with and had constructed an oil burner which might be obtainable and would answer the purpose. On February 2, 1930, Knox wrote Peterson a letter asking him if he would consider manufacturing a burner for a reliable company. There appears to have been some correspondence, as a result of which on February 19, 1930, plaintiff shipped a burner described and known as the original Model "B" to defendant's factory for testing and later in February, Knox called at plaintiff's office in Chicago and according to Peterson stated that they had made some tests and that the burner furnished by the plaintiff had shown an over-all efficiency of 84 per cent, which was better than that made by other burners which had been tested. Knox made certain suggestions, as also did Peterson, as a result of which certain changes were made.

On March 6, Peterson and Knox had a talk at LaPorte, at which time Knox stated that they had secured satisfactory results with the burner as altered. April 19, the defendant wrote Peterson that the flame was noisy, but that by covering the opening in the front of the boiler they were able to reduce the combustion noise and get a very satisfactory $C O_2$. He suggested that certain other things might be done to better the burner. In the same communication it was suggested that the engineers of the defendant might aid by providing a design for an air control which might be built into the burner.

On April 24, Knox wrote Peterson and stated that he was never more sold on the possibility of the burner and added that the cup on the burner furnished by the plaintiff had the cup on other burners "licked a hundred ways."

On April 29, the plaintiff wrote the defendant to the effect that confirming the talk over the telephone, they would continue deliveries. This it will be borne in mind was after the original shipment of the first burners of this model on April 19. June 10, the defendant wrote the plaintiff stating that they appreciated the co-operation given them and believed some day they would be able to reciprocate with a real order.

June 18, the defendant wrote the plaintiff to the effect that the installation of the machine at the Crane laboratory was faulty, but that a number of changes should be made in the burner before placing it upon the market, namely, built-in air shutter, the oil and gas valves made an integral part of the burner, a design of the cups to deaden the combustion roar, and change the gas pilot light. Also, it was found that some of the burners developed considerable play in the lower shaft which caused wear. In this communication it was also suggested that the changes might be made at the plant of the plaintiff or at the plant of the defendant.

From the evidence it does not appear that there was a built-in air shutter in the Model B that had been shipped, nor was the oil or gas valve made an integral part of the burner nor was there any expansion light. The pilot light on the Model B was the same as that which was on the original Model B which had been tested by the defendant.

July 5, the defendant notified plaintiff that they would hold the oil burners which had been shipped, subject to plaintiff's order, and negotiations were broken off.

The plaintiff, Wear Proof Mat Co., was a corporation engaged in the manufacture of mats and not in

the manufacture of oil burners. This company had never made any burners for the trade nor had any been sold except 10 or 12 which had been made by Peterson and two other men acting under his direction. These had not been sold to the trade, but to individual homes. Peterson had been experimenting with this oil burner in the hope of making it a saleable, commercial product. It is apparent from the evidence that the plaintiff knew that the Bastian-Morley Co. were new-comers in the oil burner field, and the Bastian-Morley Co. was aware of the fact that the oil burner furnished by the Wear Proof Mat Co. was in its experimental stage. The placing of these oil burners upon the market through the agency of the defendant was in the nature of a joint undertaking, both parties hoping that it would be a profitable venture. The defendant was about to enter the field in competition with others. It was necessary to procure an oil burner to be used in conjunction with its boilers that would meet this competition and furnish a new output for its boilers. Defendant was hopeful that the burner of the plaintiff would supply the requirement. It did not, however, in our opinion rely upon the plaintiff's skill or judgment. This is evidenced by the fact that defendant knew that plaintiff was not engaged in the business of manufacturing burners; that the oil burner was in an experimental stage; that defendant tried out and tested the models furnished by the plaintiff and that it did not repudiate the sale until over two months after the first shipment of burners was received. *Miami Cycle & Mfg. Co. v. National Carbon Co.*, 268 Fed. 46; *Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co.*, 23 F. (2d) 416; *Kansas City Bolt & Nut Co. v. Rodd*, 220 Fed. 750.

Upon the trial expert witnesses produced on the part of the defendant testified that when the burner was in operation it gave out a booming sound; that the

upper bearing did not receive adequate lubrication; that there was a clearance between the shaft and its bearings which was excessive; that there was some scoring on the upper shaft and that there was considerable looseness in the meshing of the gears. One of these experts so testifying was Bulger, a mechanical engineer employed by the Petroleum Heat and Power Company in its oil burning division. This witness had been employed for a number of years by the American NoKol Company prior to the time it went into the hands of the receiver, about 1921. Another witness was one Libby, professor at Armour Institute for a number of years, who had made a number of tests with oil burners. The tests made by these two expert witnesses were after the repudiation of the contract by the defendant and evidently for the purpose of testifying in the proceeding. There is no doubt but that they were experienced men and it is strongly contended that the testimony of these witnesses should be controlling because of their knowledge of the subject.

On the other hand, plaintiff introduced one Miller, a layman, in whose house one of the Model B oil burners had been installed and had been in operation since September 1931. According to this witness the operation of the machine in his home was entirely satisfactory. Another witness, one Stump, produced by the plaintiff, testified that he was a graduate of Armour Institute and employed by the board of education of Chicago as an instructor in the steam fitter branches; that he had seen a Model B burner in operation in Mr. Peterson's home and that in his opinion it was constructed in a first class workmanlike manner and that he, himself, had a Model A burner which had been running successfully in his home for the past five years. Hanson testified that he was a toolmaker and had been for a number of years; that he assisted Peterson in the development of the oil burners and

that the Model B burners which were shipped to. Bastian-Morley Co. were made under his supervision of a fine grade of material, and before they were sent to the defendant had been put through a bench test of not less than 2 hours and a number of them were run over the night, covering a period of 15 hours or more.

There was other evidence on both sides as to the practicability of this burner. There was also evidence on the part of the plaintiff that the burners were not noisy; that the clearance between the shaft and its bearings was not excessive; that the gears were purchased from the Boston Gear Works, whose product was recognized in the trade as of the highest quality; that there necessarily would result some slight scoring on the upper shaft which, however, did not impair the operation of the machine.

Aside from the fact that defendant did not rely upon the warranty there was a sharp conflict in the evidence as to whether or not the burners were so constructed as to answer the purpose.

Plaintiff was not required to furnish the best oil burner on the market, but one such as would reasonably answer the purpose. Williston on Sales, 2d Ed. sec. 243, page 486; *McNeil & Higgins Co. v. Czarnikow-Rienda Co.*, 274 Fed. 397.

The trial court had an opportunity to hear the witnesses and to observe their demeanor while testifying and it is not within the province of this court to substitute its opinion for that of the trial court as to the facts unless the finding of the trial court is manifestly against the weight of the evidence and this we are unable to say. The evidence of the plaintiff on the questions involved in and of itself was sufficient to sustain the finding of the trial court. There was a sharp conflict between the witnesses on both sides as to the practical operation of the burner. *Siegel v. Dickinson*, 163 Ill. App. 26; *Citizens Bank of Johnston*

*City v. Carr,* 194 Ill. App. 273; *Frazer v. Kuntzeman,* 195 Ill. App. 169; *Kelly v. Chicago City Ry. Co.,* 202 Ill. App. 239.

We see no reason for disturbing the judgment of the superior court and for the reasons stated in this opinion the judgment is affirmed.

*Judgment affirmed.*

HEBEL and HALL, JJ., concur.