## WILDMAN MFG. CO. *v.* DAVENPORT HOSIERY MILLS.*

### (*Nashville.* December Term, 1922.)

1. **TRIAL.** View of evidence on motion for directed verdict most favorable to opponent.

The trial judge should take the most favorable view of the evidence supporting the rights asserted by the party against whom motion for directed verdict is made, and discard all countervailing evidence. (*Post, pp.* 556, 557.)

Cases cited and approved: Walton v. Burchel, 121 Tenn., 715; Railroad v. Williford, 115 Tenn., 108; Knoxville Traction Co. v. Brown, 115 Tenn., 323; Kinney v. Railroad, 116 Tenn., 450; Norman v. Railroad, 119 Tenn., 401; Railroad v. Morgan, 132 Tenn., 1; Mayor & City Council v. Reese, 138 Tenn., 471; Johnston v. Ry. Co., 146 Tenn., 135.

2. **TRIAL.** Whole case not submitted to court by both parties moving for directed verdict.

Motions by both parties for directed verdict do not submit the whole case to the court, but each motion stands as if made and remaining alone, and is to be disposed of on its merits. (*Post, pp.* 557-559.)

3. **APPEAL AND ERROR.** Action on motions of both parties for directed verdict reviewable.

Though both parties move for directed verdict, action of the trial court in granting motion of one and overruling that of the other is reviewable on appeal. (*Post, pp.* 557-559.)

Acts cited and construed: Acts 1919, ch. 118.

Case cited and approved: Hardware Co. v. Hodges, 126 Tenn., 370.

Cases cited and distinguished: Regina Co. v. Gately Furniture Co., 154 N. Y. Supp., 888; Maggioros v. Edson Bros., 164 N. Y. Supp., 377.

---

*On effect of acceptance of goods as a waiver of damages for delay in delivery see notes in 54 L. R. A., 718; 7 L. R. A. (N. S.) 1114.
On necessity for notice of defects as prerequisite to recovery on warranty of sale see note in 50 L. R. A. (N. S.), 783.

4. **SALES.** Uniform Sales Act's requirement of notice ·by buyer of breach applies to delay in delivery.

Uniform Sales Act, section 49, providing that, while acceptance of goods by the buyer shall not discharge seller from liability for breach of any promise or warranty in contract, seller shall not be liable if, after acceptance of goods, buyer fails to give notice to seller of the breach of any promise or warranty within a reasonable time after buyer knows or ought to know of such breach, applies to failure to deliver at time specified. (*Post, pp.* 559-560.)

Cases cited and approved: Trimount Lumber Co. v. Murdough, 229 . Mass., 254; Mason v. Valentine Souvenir Co., 180 App. Div., 823; Pennel v. N. J. Brass Corporation, 186 N. Y. Supp., 606; Shearer Co. v. Kakoulis, 144 N. Y. Supp., 1077.

5. **SALES.** When questions of ·giving notice by seller of breach and of reasonable time are for jury and when for court stated.

While ordinarily the question whether notice of breach has been given by buyer, and, if so, whether within a reasonable time, as required by Uniform Sales Act, section 49 are for the jury they are for the court where the facts are undisputed. (*Post, pp.* 560-563.)

Cases cited and approved: Marmet Coal Co. v. People's Coal Co., 226 Fed., 646; M. & M. Co. v. Hood Rubber Co., 226 Mass., 181;

Chess & Wymond Co. v. La Crosse Box Co., 173 Wis., 382; Trimount Lumber Co. v. Murdough, 229 Mass., 254; Maggioros v. Edson Bros., 164 N. Y. Supp., 377; Kaufmann v. Levy. 102 Misc. Rep., 689; Mason v. Valentine Souvenir Co.. 180 App. Div., 823; Mastin v. Boland, 178 App. Div., 421; Stone v. Beim, 176 N. Y. Supp., 25; Matthes v. Benn, 107 Misc. Rep., 633; Kleeb v. Long Bell Lumber Co., 27 Wash., 648; Altkrug v. Wm. Whitman Co., 185 App. Div., 744.

Case cited and distinguished: Hesse v. Gude Bros.-Kieffer Co., 170 N. Y. Supp., 211.

6. **SALES.** Mere complaint not "notice" of breach.

Uniform Sales Act, section 49, requiring "notice to the seller of the

Wildman Mfg. Co. v. Davenport Hosiery Mills.

breach of any promise or warranty" to be given by the buyer in a reasonable time, as a condition to liability of the seller, is not satisfied by a mere complaint, but there must be language or conduct advising the seller that the buyer is looking to him for damages. (*Post, pp.* 563-584.)

Cases cited and approved: Trimount Lumber Co. v. Murdough, 229 Mass., 254; Rittenhouse-Winterson Auto Co. v. Kissner, 129 Mo. 102; Herbrand Co. v. Lackawanna Steel Co., 280. Fed., 11; Marmet Coal Co. v. People's Coal Co., 226 Fed., 646; Johnston v. C. N. O. & Tel. Ry. Co., 146 Tenn,, 135; Mastin v. Boland, 178 App. Div., 421; Kaufmann v. Levy, 102 Misc. Rep., 689; Silberstein v. Blum, 167 App. Div., 660; Mason v. Valentine Souvenir Co., 180 App. Div., 823; Chess & Wymond Co. v. La Crosse Box Co., 173 Wis., 382.

Cases cited and distinguished: Chess & Wymond Co. v. La Crosse Box Co., 173 Wis., 382; Maggioros v. Edson Bros., 164 N. Y. Supp., 377; Matthes v. Benn, 107 Misc. Rep., 633; Pierce Foundation Corporation v. Eagle Pipe Supply Co., 180 N. Y. Supp., 88.

Code cited and construed: Sec. 8449 (Gen. Code).

7. **SALES.** No notice within seven months of claim for damages for failure to deliver in stipulated time.

Evidence on counterclaim by buyer against seller for damages for failure to deliver at times stipulated machines bought *held* to show mere complaint, but no notice of claim of damages within seven months after failure to commence deliveries in stipulated time and knowledge of breach. (*Post, pp.* 584-586.)

8. **SALES.** Running of time for notice of claim of damages for delays in delivery not postponed to last delivery.

The reasonable time after buyer knows or ought to know of the breach of contract within which Uniform Sales Act, section 49, requires him to give notice of claim of damages is not determined by reference merely to the time elapsing after the last delivery, where there was delay in the first delivery, and information was then given that there would be delays in the subsequent deliveries. (*Post, pp.* 586-588.)

9. **SALES.** Notice of claim of damages for delay in delivery held not in reasonable time.

Notice of claim of damages for delay in delivery was not in the reasonable time required by Uniform Sales Act, section 49, where it was not given until seven months after delay in the first delivery and information that subsequent deliveries would be late. (*Post, pp.* 586-588.)

Case cited and approved: Hesse v. Gude Bros.-Kieffer Co., 170 N. Y. Supp., 211.

BACHMAN, J., dissenting.

FROM HAMILTON.

Appeal from the Chancery Court of Hamilton County.— HON. W. B. GARVIN, Chancellor.

CANTRELL, MEACHAM & MOON, for appellant.

ALLISON, LYNCH & PHILLIPS, for appellee.

MR. MALONE, Special Judge, delivered the opinion of the Court.

The original bill in this case was filed by the Wildman Manufacturing Company a foreign corporation, to collect the sum of about $4,000, being the balance due on certain knitting machines sold to the Davenport Hosiery Mills.

That company filed a cross-bill, claiming more than $60,000 damages because of the alleged failure of the Wildman Company to deliver the machines on time.

A jury having been demanded by the cross-complainant, the following issues were framed and submitted by the chancellor:

"I. Was it a part of the original contract between the parties that the time for the delivery of the machines was subject to delays due to unavoidable causes or conditions over which the complainant had no control?

"II. Subsequently to the making of the original contract, did the parties modify the contract so as to extend the time within which said machines should be delivered?

"III. Did complainant deliver the machines within the time required by the original contract or within the time required by the modificaticn of the contract, if there was a modification as to the time of delivery?

"IV. If you answer the last question 'No,' then did the defendant in accepting and retaining the machines and by its conduct waive any claim for damages for the delay?

"V. If you find that complainant did not deliver the machines within the time it should have delivered them, and that the defendant did not waive damage for the delay, then state what amount of recoverable damages, if any, the defendant sustained by the delay in delivery."

Proof was introduced by the parties, and each side moved for a directed verdict. The chancellor directed the jury to answer the first four issues "No," and submitted the last issue to be answered under the evidence and the charge of the court. The jury, responding to this issue, fixed the damages at $13,224.37.

On motion for a new trial, the chancellor filed a memorandum opinion, sustaining the eleventh ground of the motion, which was that:

"The verdict of the jury was so excessive as to evince passion, prejudice, and caprice on the part of the jury."

Whereupon the cross-complainant asked the chancellor to express his views as to the amount of damages, and the.

chancellor, upon this invitation, estimated that the damages should have been fixed at about one-third of the amount found by the jury, or $5,875. He stated that, if cross-complainant would enter a remittitur reducing the damages to this amount, a new trial would be refused; otherwise granted. This remittitur was accepted under protest, and cross-complainant, having admitted liability for the balance due on the machines, was given a decree for the difference between this amount ($4,046.98) with interest and the amount of the damages ($5,875) with interest—that is to say, the net sum of $1,671.94.

From this decree both parties have appealed and assigned errors, the Wildman Company complaining of the chancellor's action in directing a verdict on the first four issues in favor of cross-complainant, and in refusing to direct a verdict for complainant, also of various rulings on evidence, as well as alleged errors in the charge of the court; the Davenport Hosiery Mills Company of his action in reducing the damages.

Before discussing the chancellor's action in directing a verdict for cross-complainant, it is well to recall the rule of this court governing directed verdicts, viz. that the trial judge should take the most favorable view of the evidence supporting the rights asserted by the party against whom the motion is made, and discard all countervailing evidence. *Walton* v. *Burchel,* 121 Tenn., 715, 121 S. W., 391, 1.9 Am. St. Rep., 788; *Railroad* v. *Williford,* 115 Tenn., 108, 88 S. W., 178; *Knoxville Traction Co.* v. *Brown,* 115 Tenn., 323, 89 S. W., 319; *Kinney* v. *Railroad,* 116 Tenn., 450, 92 S. W., 1116; *Norman* v. *Railroad,* 19 Tenn. 401, 104 S. W., 1088; *Railroad* v. *Morgan,* 132 Tenn., 1, 175 S.

W., 1148; *Mayor & City Council* v. *Reese,* 138 Tenn., 471, 197 S. W., 492, L. R. A., 1918B, 349; *Johnston* v. *Ry. Co.,* 146 Tenn., 135, 240 S. W., 429.

Or, as stated in the last-named authority:

"It has been established by repeated decisions of this court that, upon a motion for peremptory instructions, the entire evidence must be looked to, and that it must be given the construction most favorable to the adversary party, and all reasonable inferences allowed in his favor, and that, if there is then seen to be a dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion should be denied."

It is also the rule of this court (contrary to the federal practice) that, where both parties move for a directed verdict, this does not submit the whole case to the court, but that each motion should stand "as if made and remaining alone, and should be disposed of on its own merits;" that, upon appeal, each party "may attack the action of the trial judge, in overruling his motion and in sustaining that of his adversary, and may put forward his contention of the facts and assail that of his adversary; and the appellate court will for itself ascertain the facts, and will determine whether the trial judge should have sustained the one motion or the other, or should have submitted the case to the jury." *Hardware Co.* v. *Hodges,* 126 Tenn., 370, 378, 149 S. W., 1056, 1058.

Pursuant to the practice above indicated, counsel have, in their briefs and in the argument, fully discussed the evidence relating to each of the issues above set out, and also that relating to the question of damages.

After carefully studying this record and the excellent briefs of counsel, we are of opinion that one of the issues submitted is decisive of the case.

Assuming, as contended by the cross-complainant, that the contract was unconditional, that the time for delivery was not thereafter extended, that there was a breach of the contract on the part of the Wildman Manufacturing Company in failing to deliver the machines on dates fixed by the contract, and that the Davenport Hosiery Mills suffered, by reason of this breach, substantial recoverable damages, yet, if the chancellor was in error in directing a verdict in favor of cross-complainant Davenport Mills on the question of waiver, the decree must necessarily be modified.

This question requires a consideration of section 49 of the Uniform Sales Act (chapter 118 of the Acts of 1919), which reads as follows:

"In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor."

This section has not been heretofore construed by this court, but has been before the courts of other states, especially the courts of New York; the questions considered having arisen not so much with regard to its meaning as to its application to a given state of facts.

The purpose of this section, indeed, seems apparent, viz. to prevent the buyer from interposing belated claims for damages (too often a mere afterthought) as an offset to a suit begun by the seller for the purchase price.

As stated in the case of *Regina Co.* v. *Gately Furniture Co.* (Sup. 1915), 154 N. Y. Supp., 888, 889, affirmed (1916) 171 App. Div., 817, 157 N. Y. Supp., 746:

"It is very evident that the purpose of this statute is to prevent the very condition that seems to exist here, viz. the buyer retaining the goods and using them, failing to give any notice of any breach of the original agreement to the seller until it has been sued for the purchase price, and then setting up affirmatively a defense by which it is sought to wipe out all of the original purchase price and demand an affirmative judgment for an additional sum against the plaintiff."

In the case of *Maggioros* v. *Edson Bros.* (Sup. March 1917), 164 N. Y. Supp. 377, 379, it was said:

"This provision is intended for the protection of the seller. The design of it is to give the seller an early notice of the alleged defects. . . . The purpose of the statute was to give the seller notice, before suit, and not by suit."

Obviously, the questions which most often arise are:

(a) Whether sufficient "notice" has been given to the seller.

(b) Whether this was given "within a reasonable time."

1. While many of the cases, discussing this section of the Sales Act, deal with breaches of warranty as to the quality or condition of goods sold, it seems to be well settled that a counterclaim for damages due to the seller's failure to deliver at the time specified in the contract also

comes within its terms. *Trimount Lumber Co.* v. *Murdough* (1917), 229 Mass., 254, 118 N. E., 280; *Mason* v. *Valentine Souvenir Co.* (1917), 180 App. Div., 823, 168 N. Y. Supp., 159; *Pennel* v. *N. J. Brass Corporation* (Sup. 1921), 186 N. Y. Supp., 606. And see *Shearer Co.* v. *Kakoulis* (Co. Ct. 1913), 144 N. Y. Supp., 1077, 1081.

2. Ordinarily the questions arising under the last clause of section 49 (whether "notice" has been given, and if so, whether "within a reasonable time") are questions of fact to be determined by the jury. But, as in other cases where the facts are undisputed, the question becomes one of law for the court. *Marmet Coal Co.* v. *People's Coal Co.* (C. C. A. 6th Cir.), 226 Fed., 646, 141 C. C. A., 402; *M. & M. Co.* v. *Hood Rubber Co.*, 226 Mass., 181, 115 N. E., 234, 235; *Chess & Wymond Co.* v. *La Crosse Box Co.* (1921), 173 Wis., 382, 181 N. W., 314, 315; *Trimount Lumber Co.* v. *Murdough* (1917), 229 Mass., 254, 118 N. E., 280; *Maggioros* v. *Edson Bros.* (Sup.), 164 N. Y. Supp., 377, 379; *Kaufmann* v. *Levy* (March, 1918), 102 Misc. Rep., 689, 169 N. Y. Supp. 454; *Mason* v. *Valentine Souvenir Co.* (1917), 180 App. Div., 823, 168 N. Y. Supp., 159; *Mastin* v. *Boland* (1917), 178 App. Div., 421, 165 N. Y. Supp., 468; *Stone* v. *Beim* (Sup. 1919), 176 N. Y. Supp., 25; *Matthes* v. *Benn* (1919), 107 Misc. Rep., 633, 176 N. Y. Supp., 770; *Hesse* v. *Gude Bros.-Kieffer Co.* (Sup. 1918), 170 N. Y. Supp., 211. And see *Kleeb* v. *Long Bell Lumber Co.* (1902), 27 Wash., 648, 68 Pac., 202.

The case of *Hesse* v. *Gude Bros.-Kieffer Co.*, supra, contains a very interesting discussion of the question of "reasonable time," in the course of which it is said:

"Reasonable time means what under the circumstances a reasonable, prudent man would do, and is always, it

would seem, properly speaking, a question of fact, with
the usual proviso, however, that whether there is any
evidence to support a finding of fact is a question of law,
and this is doubtless all that is meant by the statement
often found in the cases that the question of reasonable
time is for the court."

3.  The application of these principles to the instant case
necessitates a review of the evidence bearing on this point,
and incidentally a fuller statement of the whole case.

We shall assume, without deciding, that the contract in
this case was made, as contended by cross-complainant
Davenport Mills, about August 8, 1919, in a telephone
conversation between Mr. Fred, the manager of cross-
complainant, and Mr. Allerton, a salesman o_ the com-
plainant, Wildman Company.  It is contended for the
Wildman Company that Mr. Allerton was a mere salesman,
with no authority to make an unconditional contract, and
that, by reason of certain "pink slips" promptly mailed
to the cross-complainant, the Davenport Mills, it was noti-
fied that the contract was made, as stated on the face of
these slips, "subject to unavoidable delays."

As above stated, we do not find it necessary to pass on
the contention that these pink slips constitute part of the
contract, or the contention of cross-complainant that they
could not affect or modify its terms.  See *Altkrug* v. *Wm.*
*Whitman Co.* (1919), 185 App. Div., 744, 173 N. Y. Supp.,
669.

We shall assume: That the contract was unconditional.
That time was of the essence of the contract, and that by
its terms the complainant, Wildman Manufacturing Com-
pany, was obligated to deliver the forty-eight knitting

147 Tenn.—36

machines purchased as follows: Ten not later than the middle of November, 1919; ten not later than the middle of December, 1919; ten not later than the middle of January, 1920; ten not later than the middle of February, 1920; and the remaining eight not later than the middle of March, 1920. That the Wildman Company agreed that, if possible, it would deliver the machines at earlier dates, and that it would positively guarantee delivery at the times stated.

Mr. Fred, manager of the cross-complainant, states that—"According to our contract, by March 12th, all of the machines should have been in the house—I mean should have been shipped."

He further says: "I allow fifteen days for machines to get here and get installed and get ready to go to work."

The uncontradicted evidence shows that the machines were actually delivered on the following dates: three, January 12, 1920; three, January 15, 1920; three, January 27, 1920; two, January 20, 1920; one February 6, 1920; three, February 18, 1920; two February 20, 1920; two, February 25, 1920; two, March 6, 1920; two, March 15, 1920; one, March 18, 1920; two, March 20, 1920; one, April 2, 1920; two, April 21, 1920; fourteen, May 28, 1920; two, June 8, 1920; one, June 12, 1920; one, June 18, 1920; one, July 1, 1920.

The price of the forty-eight machines was $347 each, payable net 30 days, and payments were made by the Davenport Mills as follows: February 12, 1920, cash for eleven machines, $3,817; March 12, 1920, cash for eight machines, $2,782; April 14, 1920, cash for seven machines, $2,465; May 13, 1920, cash for three machines, $1,059; September 13. 1920, on balance of account, $1,000; September 22, 1920,

credit allowed against certain parts bought earlier in the year for another type machine, which they asked the cross-complainant to take back, $1,663.24.

4. As to the question of "notice":

Before examining further the evidence on this point, it may be well to consider what is meant by giving "notice to the seller of the breach of any promise or warranty."

Is a mere complaint sufficient?

Or, must there be such language or conduct on the part of the buyer as to advise the seller that the buyer is looking to him for damages caused by his breach of contract?

Though we have found no case discussing this specific point, a consideration of some of the decisions dealing with this clause may be helpful.

In the case of *Chess & Wymond Co.* v. *La Crosse Box Co.* (1921), 173 Wis., 382, 181 N. W., 314, suit was brought by the seller to collect a balance due under contract for the sale of "kiln-dried gum veneer."

Payment was resisted, and counterclaim made, on the ground that the veneer was not properly dried. The trial judge directed a verdict for plaintiff, holding that on the uncontradicted evidence the defendant had failed to give notice of its claim to the plaintiff within a reasonable time, as required by section 49 of the Sales Act.

The defendant relied on a letter written January 23, 1918, after the delivery of the goods, in which the defendant advised the plaintiff that it expected to purchase three cars of yellow pine veneer, and would like to have quotations from the plaintiff.

The letter continues:

"The stock must be dried more thoroughly than what you have shipped us heretofore. Some of the stock

you shipped us before seemed to be as green as if it had just come from the log and consequently it cost us considerable time and money to work. Quite a number of boxes were returned to us on account of the large cracks between the boards. Also some of the boxes were warped out of shape and were returned for that reason.

"We await your quotations on veneer that is in dry condition and ready to be used."

The Supreme Court of Wisconsin held this letter insufficient, saying:

"The holding of the trial court is fully warranted by the undisputed evidence.

"The first car was received by the defendant on November 14, 1917, more than two months prior to the time of the writing of the letter of January 23.

"Although some complaint is made in the letter of January 23, no claim for damages is made by reason of the defective condition of the material shipped by the plaintiff. . . . The letter of January 23, 1918, is a complaint that the stock was not thoroughly dried, and nowhere in the letter is there an intimation that the defendant claimed a breach of any promise or warranty on the part of the plaintiff."

Again: "This letter did not apprise the plaintiff that the defendant expected to make any claim for damages on account of the quality of the material which it had received prior thereto."

The action of the trial judge in directing a verdict against the counterclaim and in favor of the plaintiff was therefore affirmed.

The case of *Trimount Lumber Co.* v. *Murdough*, 229 Mass., 254, 118 N. E., 280, was decided by the supreme

· court of Massachusetts in 1917, and involved a suit for the price of certain lumber sold to the defendant. The defendant filed a counterclaim, seeking damages for defects in the lumber, and because of delay in shipment.

The last delivery of lumber was made on March 23, 1910, and no claim for damages for nonfulfillment was made down to April, 1911, "other than a notification twice repeated that if the 3x4 material needed for the first floor was not delivered promptly the defendant would buy it in the Boston market."

After quoting section 49 of the Sales Act, the supreme court approved the action of the trial judge in charging the jury:

"That, if the defendant claimed to have been damaged through delay in delivery or lack of quantity or quality of which he knew or ought to have known, and failed within a reasonable time after acceptance to notify the seller that he claimed damages although particular defects need not be specified, he could not recover, even if he had suffered damages from the breach," and further approved his action in leaving to the jury "the question whether under all the circumstances such notice had been given."

The court further says: "A notice that if the material needed for the first floor was not delivered promptly the defendant would buy it elsewhere, is not notice of a breach of the contract for which damages would be claimed."

At the close of the opinion it is said: "We add to avoid any misconception that, the facts not being in dispute, the question whether the judge should have ruled as matter of law that the defendant had not acted within a reasonable time, not having been raised at the trial, has not been considered."

The intimation seems to be that a directed verdict would have been approved.

In the case of *Rittenhouse-Winterson Auto Co.* v. *Kissner,* 129 Mo., 102, 98 Atl., 361, the buyer brought suit for breach of warranty in the sale of a truck, claiming defects.

To the suggestion that section 70 of the Maryland Sales Act (Code, article 83), same as section 49, supra, might bar the action, the supreme court replied:

"This provision is not available to the defendants, because the proof is that the truck was repeatedly sent to their shop by the plaintiff for repairs and that they were thus apprised of the difficulties he was having in its use and operation."

Judgment for plaintiff was, however, reversed on another ground, and the observation concerning this section of the Sales Act seems merely incidental

The case of *Herbrand Co.* v. *Lackawanna Steel Co.,* 280 Fed., 11 (C. C. A. 6th, 1922), involved a consideration of the corresponding provision of the Ohio Sales Act.

In that case plaintiff sued for the price of certain steel, and the defendant counter-claimed for damages for breach of the implied warranty of fitness of steel formerly purchased and paid for.

The trial judge directed a verdict for plaintiff on the supposed authority of *Marmet Coal Co.* v. *People's Coal Co.* (C. C. A. 6th Cir.), 226 Fed., 646, 141 C. C. A., 402, holding that defendant's right to seek damages was barred by payment of the full purchase price with knowledge of the defects.

The court of appeals, however, held this to be error, saying that *Marmet Coal Co.* v. *People's Coal Co.,* supra,

did not bear the construction placed on it by the district judge, and that the question of damages should have been left to the jury.

With reference to the provision of the Ohio Sales Act (General Code, section 8449), as to notice, etc., the court says:

"In the instant case no question of due notice of breach is involved, for previous to the giving of the acceptances plaintiff had been notified that the steel was seamy and unfit for defendant's purposes."

Counsel for the Davenport Mills rely on this statement of the opinion as supporting the action of the chancellor, but a further examination of the case shows demands for replacement of t' e defective material on the part of the buyer, and the actual presentation of "a statement claiming damages, including 'cost of defective material, labor cost,' " etc.

These complaints, conferences, and demands extended over a period from the early part of May, 1918, until September, 1918, or later, the "statement claiming damages" being furnished to the seller's representative on September 1st.

"Trade acceptances" had been given for three-fourths of the price of the steel on June 4, 1918, and on June 21, 1918, the remainder of the price was paid in cash.

It thus appears that a specific itemized claim for damages was submitted to the seller by the buyer in the above case, and the court's statement as to the effect of the Ohio Sales Act above quoted, should doubtless be considered in the light of this and the other facts above mentioned.

5.  What, then, are the facts disclosed by the present record?

The evidence shows numerous letters passing between the parties, and Mr. Fred, manager of the Davenport Mills, testifies as to certain interviews between himself and Mr. Allerton, the representative of the Wildman Company, heretofore mentioned. The letters, of course, speak for themselves, and, since Mr. Allerton does not testify, Mr. Fred's evidence as to the interviews is uncontradicted.

Does the evidence show notice, by the Davenport Mills, of its intention to claim damages for breach of contract against the Wildman Company?

On October 16, 1919, Mr. Fred wrote the Wildman Manufacturin. Company, asking it to anticipate shipment if possible, and, if this was impossible, "please get them out on the date you promised, that is, the first ten November 19th. Our building is already completed, and we have the material and are waiting on your machines."

The Wildman Company replied on October 20, 1919, saying that "we fully expect to make shipment by the time promised."

On November 25, 1919, the Davenport Mills wrote that no bill of lading covering the first ten machines had been received and further said:

"We are very badly in need of these machines, and have our buildings completed, and have yarns on hand, and are unable to make goods because we haven't the knitting machines. Please make a very special effort to commence shipment of these machines at once."

On November 28th the Wildman Company replied:

". . . We are about one month behind in our deliveries due to conditions over which we have no control; and therefore it will be about two weeks before we can

make shipment. Regretting the delay, we beg to remain," etc.

This, as will be observed, showed a breach of the unconditional contract claimed by the Davenport Mills.

On November 26, 1919, the Davenport Mills wrote another letter, saying: "We have never received B/L for the first shipment of Pigeon machines. We are very badly in need of these machines, and are disappointed at the delay. We understood from your letters and from your Mr. Allerton, that you were going to make shipment this month. Please do not fail us."

The Wildman Company did not reply until December 23, 1919, when it wrote·

"We are in receipt of your favor of the 26th, in reference to the delivery of Pigeon machines. In reply beg to advise that we will make a special effort to deliver ten machines during the month of January, 1920. We have been delayed due to conditions over which we have no control. Trusting that this will be satisfactory and regretting the delay, we remain," etc.

On December 29, 1919, the Davenport Mills replied:

"We have your letter of December 23d, stating that you will make a special effort to deliver ten machines during the month of January, 1920.

"We are not knockers or kickers, and we certainly try to be considerate of everybody, and realize fully the present conditions and difficulty of getting out full production, but we feel that we have been too good a friend of the Wildman Mfg. Company to be treated in the way we have been. We feel that we deserve a good deal more consideration than you have given us in regard to these Pigeon machines."

After stating that "the writer has always been a booster for Wildman Machinery," and that the president of the company, interested in a great number of plants, "has been a large user of your machinery in the past, and will be in the future," the letter continues:

"Without boastfulness, we think we have built the finest hosiery mill of its kind in the United States. It is our purpose to fill this building with four hundred or more Pigeon machines eventually. We have gone to every possible expense, and turned heaven and earth to get our building done. You promised us to deliver ten Pigeon machines in November. They did not come. Then you promised again to make shipment in December, and you did not do so. Gentlemen, we are in desperate need of these machines. We have our building done, and no machines to put in it. We have quantities of silk bought, at very high prices, and no way to knit it up.

"We must have ten Pigeon machines right away, and to follow with ten a month until this order is completed.

"With the season's best wishes," etc.

While this letter is full of complaints, and refers to the broken promises of the Wildman Company, we see nothing here indicating an intention to claim damages for breach of contract. The intimation is, rather, that the Wildman Company, if it persists, will alienate good friends and lose valuable future custom.

The Wildman Company replied on December 31, 1919, acknowledging receipt of this letter, and saying:

"We are very sorry that we cannot hold out very much hope of your getting the machines on order promptly, as we are simply swamped. Frankly, the conditions are as follows:

"We are making less than thirty machines a week, and are to-day over four hundred machines behind in our promises. We have about three thousand machines on order, so you can see at our present rate of production it would take two years to fill the machine now on the books.

"We, of course, figure on increasing our output as fast as possible, but, assuming that we were able to triple it in four months, which is hardly likely to-day, when equipment is so difficult to obtain, it would still take us six to eight to clean up the orders we now have on hand.

"As you have always been a very good customer of ours, you can rest assured that we will do everything we can for you, and it is a great disappointment that conditions are such that we cannot give you the service we would like to.

"Wishing you a very prosperous New Year," etc.

Instead of replying to this letter, the Davenport Mills, in the first part of January, 1920, a few days prior to January 20th, sent Mr. Fred to visit the Wildman Company at its plant; and there the matter was discussed with Mr. Allerton and others, principally Mr. Allerton.

"I impressed on them," he says, "the importance of getting the machines; that we were already far behind with deliveries. They told me at that time they had shipped me two or three machines, which I had not gotten notice of when I left home.

"I told them we were suffering a great loss on account of the fact we cou'd not knit up the goods and sell the goods, and explained that we were in desperate need of the machines."

Mr. Allerton thereupon suggested that shipment might be expedited by making a change in the size of the cylinders.

Mr. Fred agreed to this with the idea of getting the machines sooner. He says that he did not then, or at any other time, agree to an extension of the contract.

On January 20, 1920, the Davenport Mills wrote the Wildman Company the following letter:

"We have received six of the machines on order with you, via express. We understand you are going to ship as nine more this month. As it takes a little while for our machinist to get these machines adjusted, we wish you would ship the remainder of the machines by freight, and keep up the shipments, so that by the time we get one shipment in and adjusted, and ready to run on silk work the others will be in.

"By changing this we don't want you to get the idea that we are not in urgent need of these machines, for we are. As explained to you on my recent visit, we are right up against it, and simply must have the machines.

"Thanking you for your efforts to hurry the delivery of our machines," etc

On January 21, 1920, the Davenport Hosiery Mills wrote the Wildman Manufacturing Company, requesting the change of cylinders to be made in "the remainder of the Pigeon machines we have on order with you"—this to be done "in compliance with our conversation a few days ago."

The letter continues:

"Of course, let the machines you have laid out for us this month and started operation on, come through as formerly specified. Do not delay shipment on account of this change, but let the remainder of the machines come in 3¾" cylinder. Also ship one of these machines with a 4" cylinder, 280 needles. This is for making out-sizes."

Wildman Mfg. Co. v. Davenport Hosiery Mills.

On February 3, 1920, the Wildman Company replied, acknowledging receipt of the letter, and saying:

"We have a number of 3½", 240-needle machines under way. However, we will be able to change twenty-eight of the machines that you have under your first order. Twenty-seven of these machines we will make 3¾", 260 needles, price $353 each. One machine, 4", 280 needles, price $359. We will give the order careful attention, and ship them to you as soon as possible.

"Trusting we have your order changed correctly, we remain," etc.

The marked contrast in tone between these letters of the Davenport Mills and those previously quoted will be observed. While "urgent need" is mentioned, the company was evidently unwilling to pay the difference between express and freight charges.

Mr. Fred testifies that Mr. Allerton visited Chattanooga "in the early part of the year 1920" once or twice, and came to see them. He says further:

"I think he was down here in either January or February, the first part of the year, after the machines had been delayed, and I think he was down here again a little later, if I am not mistaken. I know he was down here after the machines had been delayed and we had gotten some of the machines in, but not all had come in. I think he was down here about the time the last were being delivered. On these occasions I complained to him that I had lost—had suffered losses on account of the delay in delivery of these machines. I explained to Mr. Allerton fully at the time that we had lost a great deal of money on account of these machines being delayed; that we had suffered a much greater loss than the cos of the machines;

and he discussed the matter with me and understood that thoroughly."

It will be noticed that the witness says he "complained" and "explained" about the losses, but will not say that he notified the Wildman Company's representative that the Davenport Mills was looking to the Wildman Company for reimbursement on account of its breach of contract.

A little further on in his testimony, he comes back to this subject, saying:

"I told Allerton that we had lost a great deal of money on account of their failure to deliver the machines on time. I told everyone that I saw connected with the company that we were suffering greatly and had lost a lot of money by their failure to live up to their contract."

The record does not seem to show that any representative of the Wildman Company, other than Allerton, visited Chattanooga, unless the man who was sent to show the Davenport Mills how to run the machines can be considered a representative.

On cross-examination, Mr. Fred is still more indefinite about the date of Allerson's visits to Chattanooga. Thus he testifies:

"Mr. Allerton came to Chattanooga during the year 1920, and I believe he was here in 1921. If I remember correctly, he was here twice in 1920. The first time I think was some time before August. I am very positive he was here once before that. I can't fix that date in any way, except for the fact that at that time we were running those Wildman Pigeon machines, we were running them, and I remember inviting him to go up and look at them running, and I believe he said he was busy and it was not of any special interest to him to go up there. I know we did not

run them after the market broke, and that is the reason I am certain that must have been at an earlier date before that. We might have run them a little after the first of May, and started slacking off running them at that time, and stopped running them altogether soon thereafter. I think he was here before May 1st of that year. I cannot fix what month, but I can fix it back in that time, for the reason the machines were running."

Of course the cross-examination, as well as the direct examination, must be looked to on motion for a directed verdict (*Sands* v. *Southern Ry. Co.*, 108 Tenn., 1, 9, 64 S. W., 478) ; and, looking to the cross-examination, we think it would be mère caprice on the part of a jury to fix the date of these visits to Chattanooga at any particular time between January and May, 1920  See *Johnston* v. *C. N. O. & Tel. Ry. Co.*, 146 Tenn., 135, 158, 240 S. W., 429.

We may add that this uncertainty is increased by the letter which the witness wrote for the Davenport Mills under date of August 13, 1920, hereinafter referred to, in which he says that "our mill has been closed down for the last two months." This would seem to show that the mill ran on into June.

On March 6, 1920, the Davenport Mills wrote the Wildman Company, saying:

"We have gotten a number of the spring needle machines, and have them lined up ready to run, but our machinists are not familiar enough with these machines to get along without some help from you people. As you know, this is a new type of machine in the south, and nobody is familiar with it.

"We want you to send down an experienced fixer to stay with us two week s or more, and train our boss knitter how

to fix these machines. After our men understand the principles of the machirery, we can handle the situation without any trouble. The sooner you can send a man here the better, as we have eve.ything in readiness now to go ahead. We do not want our machinists 'o go. these machines in bad shape through ignorance. You doubtless realize the importance, to you, as well as to us, to get us started off right on this new type . f machinery."

On March 16, 1920, the Wildman Company replied that it had "arranged to have one of our men leave here Sunday night so as to give your mechanics the proper instructions," etc.; and the man was sent accordingly.

In April "the market began to show evidence of breaking," and in the early part of May the market "broke," and prices declined to such an extent that manufacturing silk hose became unprofitable. Accordingly, at some date not clearly defined by the evidence, but apparently in May or June, 1920, the D v--port Mills ceased to operate its plant.

As heretofore shown, the Davenport Mills, on May 13, 1920, paid the Wildman Company the sum of $1,059, being the price of the three machines delivered in the month of April.

After this payments ceased until September 13, 1920, at which time it paid $1.000 on balance of account.

In the two months following May 13th, the Wildman Company seems to have made various demands for further payments, by letters not appearing in the record.

Finally, a letter was written under date of August 10, 1920, apparently suggesting (the letter does not appear in the record) that draft would be made for the balance due.

On August 13, 1920, the Davenport Mills answered this as follows:

"Replying to your letter of August 10th, it is entirely useless for you ever to draw on us.

"We would like to remind you of the fact that you were six months or a year late in delivering these machines. If you had delivered them on time they would have paid for themselves in three months' time. But you waited until business conditions had gotten quiet before you delivered them. Two-thirds of these machines have not even been run because business is dead. On account of your failure to deliver on time, we lost several times the price of the machines.

"Our mill has been closed down for the last two months, and it is probable it will stay closed down for several months more.

"Business conditions are such that we cannot pay for them now. There are only two things we see open. You can either wait on us to pay for them until we are able to, or else you can have them crated up and sent back to you. It is immaterial to us which course you take."

No reply appears in the record, but on September 16, 1920, the Davenport Mills wrote as follows:

"What is your present price, to-day, on Pigeon 260 needle spring needle machines? What would you allow us for the fifty machines we bought from you? Several of these have never been run. Over half of them have just been uncrated and never been run at all, and none of them have been run more than a week. We have knit only five or ten dozen on any of them. They are absolutely new machines in good shape."

147 Tenn.—37

On September 24, 1920, apparently replying to some letter which does not appear in the record, the Davenport Mills wrote:

"Is the ri  ber you quoted us on plain type? We do not want the French welt ribber.

"We note what you say about not being able to deliver for five or six months. We only want two of these machines. This would enable us to run the spring needle machines we have from you, and we think the least you could do would be to get the two machines some way. You were several months late delivering our spring needle machines. We have never been able to operate them, and our present predicament is due to the fact we could not get the machines at the time we needed them.

"We think you peo    should show some spirit of cooperation and help us out, when we are not asking much, and give us at once delivery on these two machines. We have both 240 needle and 260, if you could not give us the 520-needle ribbers couldn't you give us the 480-needle ribbers. Please advise us what we can expect."

On September 29, 1920, the Davenport Mills again wrote:

"We note that you cannot take back any of the spring needle machines we have on hand, although they have not been run.

"Doubtless you realize the fact that you were somewhere around six months late delivering these machines, and our loss is due to your failure to deliver.

"We hate to advertise these for sale or exchange in the trade journals as new Wildman Spring Needle Machines, at a discount. It is not good advertising for yo , and it strikes us it would be better business policy for you people

to offer to take these new machines off our hands at a discount.

"Please advise us whether you are willing to make any offer on them."

Thereafter, the Davenport Mills advertised these machines for sale, and about May, 1921, sold them for $8,000.

Mr. Howe, general manager of the Wildman Company, was introduced as a witness in its behalf, and so much of his examination as relates to this subject is as follows:

". . . There is a letter in the record dated August 13, 1920, in which the Davenport Hosiery Mills refers to the fact that they have been damaged by delays in the delivery of the machines. Before that time, I think, no complaint was made to any of the officers of the Wildman Company about any damage having been suffered or any demand made for any damages suffered. No question or any demand for damages suffered came up until the Davenport Hosiery Mills were being vigorously pressed upon its account and it had been written that we would draw upon them for it."

As previously stated, the chancellor directed the jury to answer this issue in favor of the Davenport Mills. After quoting from, and commenting upon, the letter of August 13, 1920, heretofore set out, he says:

"I think that this letter is within the terms of our statute, and a sufficient claim or notice of damages, delivered on August 13th, and the last machines were delivered July 1st, I think it is in time, so I will instruct you to answer this fourth question 'No.' "

It will be noted that the chancellor seemed to be of opinion:

(a) That the facts were undisputed.

(b) That a claim for damages, and not merely a complaint or announcement of trouble, was necessary.

(c) That the other correspondence and conversations shown by the record were insufficient to satisfy the statute.

(d) That a "reasonable time" would begin to run from July 1st, when the last machine was delivered.

(e) That as matter of law the letter of August 13th, written about a month and a half from that date, was written within a reasonable time, and gave sufficient notice.

6.   Before taking up these conclusions of the chancellor, it will perhaps be helpful to consider, in the light of certain decisions, the question of "reasonable time" under this section of the Sales Act.

As already indicated, this is, in general, a question of fact for the jury, but when the facts are undisputed it may become a question of law for the court.   Authorities supra.

While, therefore, each case of this kind must turn upon its own facts, an examination of some of the decided cases may be of assistance.

In Maggioros v. Edson Bros. (Sup. 1917), 164 N. Y. Supp., 377, a claim was made within two weeks from the receipt of certain goods, and not until two months after the receipt of the remainder.   Examination of the goods would have readily disclosed the defects.

The evidence, being undisputed, held:

(a) That the two months' notice was, as matter of law, not given within a reasonable time.

(b) That whether the two weeks' notice was sufficient

was, under the circumstances, properly submitted to the jury.

In the case of *Matthes* v. *Benn* (1919), 107 Misc. Rep., 633, 176 N. Y. Supp. 770, where goods were not examined for two months after receipt, the court said:

"It may well be that, in the ordinary course of trade, failure to personally examine goods for a period of sixty days after delivery might, as matter of law, be held to forfeit the purchaser's right either to rescind the sale or to recover for breach of warranty, in contrast to the general rule that reasonableness of time is a question of fact for the jury."

But under the exceptional facts of the case (confidence having been reposed in an employee recommended by the seller) the question was allowed to go to the jury.

In *Stone* v. *Beim* (Sup. 1919), 176 N. Y. Supp., 25, the lower court instructed the jury as matter of law that a claim made within ten days from the delivery of the goods was not made within a reasonable time. The appellate court held that that time "could not be said as a matter of law to have been an unreasonable one," etc. It therefore reversed the case, holding that the trial court should have submitted to the jury the question "whether under all the circumstances disclosed by the record . . . ten days was a reasonable time within which to give notice to the plaintiffs of the nonacceptance of the goods."

In the case of *Mastin* v. *Bolland* (1917), 178 App. Div., 421, 165 N. Y. Supp., 468, it was held, reversing the trial judge, that he should have submitted to the jury the question whether notice within three weeks after the sale was given within a reasonable time, the court indicating the

opinion that such notice was reasonable, under the facts as claimed by the defendant.

In the case of *Kaufmann* v. *Levy* (1918), 102 Misc. Rep., 689, 169 N. Y. Supp., 454, the goods were delivered on April 16th; it was the custom of the trade to make examination within ten days; defendant, who set up a counterclaim, saw the goods two or three times a day, but did not examine them until March 9th or 10th, twenty-three days after acceptance.

The court held, as matter of law, that failure to give notice until twenty-three days after acceptance, under the circumstances mentioned, precluded the buyer from setting up a counterclaim, under this section of the Sales Act, notice not having been given "within a reasonable time."

In the case of *Silberstein* v. *Blum* (1915), 167 App. Div., 660, 153 N. Y. Supp., 34, the goods were delivered on July 28th, and not examined by the buyer. He left the city on August 3d, and did not return until August 13th or 14th. Between the 13th and 18th of August he had a conversation with the seller and requested him to take back one case of goods, offering to pay for the other. Upon the seller's refusal to do this, the buyer said the goods looked imperfect and that he would have them examined, etc.

Next day the seller brought suit, and the buyer set up a counterclaim for defects in the goods.

Held, reversing the lower court, that, "notwithstanding a reasonable time had elapsed," no effort had been made to return the goods, etc., and that the counterclaim must be dismissed and judgment entered for plaintiff.

In the case of *Pierce Foundation Corporation* v. *Eagle Pipe Supply Company* (Sup. 1920), 180 N. Y. Supp., 88, suit was brought for the value of certain pipe sold, and

the buyer set up a counterclaim for damages because the pipe were the wrong size, and their use had necessitated increased expense, etc.

On appeal, the plaintiff contended that the counterclaim should have been dismissed, for failure to give notice within a reasonable time, and on this point the opinion reads as follows:

"I think the contention is sound. The plaintiff saw the pipe as it was delivered, and knew that it did not conform in diameter to its order. It kept the pipe and used it. It was not until four months later that it first notified defendant of any claim for damages."

For the error in failing to dismiss the counterclaim the case was reversed.

The case of *Mason* v. *Valentine Souvenir Co.* (1917), 180 App. Div., 823, 168 N. Y. Supp., 159, was a suit brought by the buyer for damages occasioned by the seller's failure to deliver picture post cards at the date promised.

The buyer was a dealer in picture post cards and souvenirs, at a place in the Catskill Mountains. He ordered 6,000 cards, which were to be printed with his name on them; and it was agreed that delivery would be made June 1st.

The seller did not make the first shipment until June 18th, and this was followed by shipments made respectively on June 20th, July 2d, July 6th, July 22d, and July 25th.

The buyer received the first five shipments (which comprised about five thousand one hundred of the cards), but refused to take from the railroad the shipment of July 25th.

Statements of indebtedness were sent by the seller and ignored by the buyer, and on December 1st the buyer brought suit for breach of contract, claiming damages for delay, etc.

Reversing the lower court, it was said:

"The unreasonable delay of the plaintiff, wholly unexplained, in failing to give any notice of the alleged breach of the contract as to time of delivery, and in allowing continued shipments to be made without objection or complaint of any kind on his part, barred any action to recover damages for deferred delivery"—citing this section of the Sales Act.

In the case of *Chess & Wymond Co.* v. *La Crosse Box Co.* (1921), 173 Wis., 382, 181 N. W., 314, already reviewed, the supreme court of Wisconsin sustained a directed verdict where the seller's letter of complaint did not contain a claim for damages; and where the first car containing the defective material was received by the buyer on November 14, 1917, and the letter was not written until January 23, 1918. The court calls attention to the fact that the first car was received "more than two months prior to the time of writing this letter of January 23d."

7. Coming now to the chancellor's conclusions, we agree with him that the evidence was undisputed.

We are also of opinion, as he apparently was, that the letter of August 13, 1920, was the first notice of a claim for damages within the meaning of this statute. Although this letter contained a statement of willingness to pay the balance when the company was "able to," there was a definite refusal to pay a draft at that time, and this refusal

was placed on the ground of the damages suffered by the Wildman Company's delay.

We think the conversations in Chattanooga between Mr. Fred and Mr. Allerton are entirely too indefinite as to time where time is of the greatest importance, if they were otherwise sufficient to establish "notice."

The Davenport Mills, up to May 13th, made regular payments for the machines shipped in the preceding months, and then ceased making payments at the direction of its president, Mr. Davis. He testifies:

"During the early part of—well, the latter part of 1919 and early part of 1920, my recollection is, I was urging Fred to get these machines in, and was told later on, of course, that he had made payments on them. I told him I would not pay any more."

Mr. Fred testifies: "I do not think Mr. Davis knew I had made the payments until I informed him of it. I made no other payment after I informed Mr. Davis of the payments I had made. I was governed by Mr. Davis' instructions, because he was the president of our company and his views and instructions were carried out by me."

While the exact date at which Mr. Davis gave directions to cease payments is not shown, it may be inferred that this was after May 13, 1920, when the last regular payment was made. The letter of August 13th, supra, seems to have been the first letter written by the Davenport Mills after May 13, 1920, and it was written in response to demands for payment made by the Wildman Company, as hereinbefore stated.

We are therefore of opinion that the letter of August 13th might have been considered evidence of notice on the part of the Davenport Mills to the Wildman Company of a

claim for damages which it intended to assert against the Wildman Company, on account of its delay in shipping the machines, and the testimony of Mr. Howe, already quoted, seems to show that the Wildman Company so considered it.

8. But we think the chancellor was in error in telling the jury that the question of "reasonable time" must be determined with reference to time elapsing after July 1, 1920, when the last machine was received. As heretofore shown, the Wildman Company on November 28, 1919, advised the Davenport Mills that "it will be abo t two weeks before we can make shipment." This, of course, was a breach of the contract, on the theory of the unconditional contract which the Davenport Mills set up.

On December 23, 1919, the Wildman Manufacturing Company wrote, "we will make a special effort to deliver ten machines during the month of January, 1920."

Under the theory of the Davenport Mills, ten machines should have been shipped in November and ten in December.

On December 31, 1919, the Wildman Company wrote, fully explaining its situation, showing they were then over four hundred machines behind on their promises, and stating that, if they were able to triple production, "it would still take us six or eight (months) to clean up the orders we now have on hand."

The Davenport Mills, according to the testimony of its officials, knew that it was going to sustain losses by the failure to get these machines on time, because its officials recognized that an extraordinary market was prevailing at and prior to the time f the contract.

Speaking of an interview with Mr. Allerton, before the contract was made, Mr. Fred testifies:

"I told Allerton on account of the abnormal conditions there was an abnormal profit in hosiery, and that, in addition to that, we knew that this thing could not last long, that it was just an abnormal condition, and that we had our material all bought, our silk at high prices; we stood in the way to lose an enormous amount of money, which we did lose later on."

Assuming, as we do, for the purposes of this discussion, that the facts claimed by the Davenport Mills are true, its officials knew, or as reasonably prudent men should have known, at latest when the company received the letter of the Wildman Company dated December 31, 1919, supra, fully explaining the conditions at its plant, that there was a breach of the contract which would cause it (the Davenport Mills) to suffer damages.

As stated in the case of *Hesse* v. *Gude Bros.-Kieffer Co.* (Sup. 1918), 170 N. Y. Supp., 211, "when the plaintiff knew of the breach of warranty, or ought to have known it—that is, a reasonably prudent man would have known it"—the duty devolved upon the plaintiff to give notice within a reasonable time of its claim for damages.

The letter of August 13, 1920, therefore, was at least seven months after receipt of the letter of December 31, 1919, and something like nine months after the first breach of the contract, as indicated in the Wildman Company's letter of November 28th, supra.

The facts being undisputed, we think the chancellor should have instructed the jury, as matter of law, that the claim of the Davenport Hosiery Mills was not made within a reasonable time, under the provisions of section 49

of the Uniform Sales Act, and that no damages could be allowed under the cross-bill.

Since it was conceded below that the Wildman Company was entitled to a decree for the balance due on these machines, and for which it brought suit, viz. $4,046.98, unless damages should be allowed under the cross-bill, it results that the decree of the chancellor will be modified by dismissing the cross-bill and disallowing the amount of damages assessed thereunder, and giving a decree to the complainant for the balance of $4,046.98, admitted to be due, and as thus modified, it will be affirmed.

BACHMAN, J., dissents.